Philip A. Koch
Plaintiff *in Propria Persona*
10707 Fieldstone Dr.
Bakersfield, CA 93306
(661) 401-3818
norgevikes@gmail.com



**FILED**

OCT 19 2022

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK



## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
510 19th Street, Bakersfield, CA 93301

PHILIP A. KOCH
PLAINTIFF

v.

CALIFORNIA WATER SERVICE COMPANY
DEFENDANT
_____/

CASE NO. 1:22-CV-01333-ADA-CDB

## COMPLAINT FOR DISCRIMINATION, RETALIATION, AND PROHIBITED ACTIONS ON THE BASIS OF DISABILITY

Philip A. Koch  ("plaintiff"), sues California Water Service Company ("defendant") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

# PARTIES

1.      The plaintiff resides in Bakersfield, California at the address of 10707 Fieldstone Dr., for all times material to the facts giving rise to the complaint.

2.      The defendant is an "employer" within the definition of 42 U.S.C. 12111(5), with their principal place of business at 7501 Valley Ln., Bakersfield, CA 93306, for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

3.      This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

4.      Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

5.      The plaintiff timely filed a charge of discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of December 17, 2021. The plaintiff has exhausted all administrative remedies and obtained his right to sue letter from the EEOC within the ninety days preceding the date on which he commenced his original complaint against the defendant. A true and correct copy of the EEOC's right to sue letter is alleged and included as Exhibit A.

6.      The plaintiff has exhausted all administrative remedies available to him.

## BACKGROUND

7.      Since 2020, the defendant adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical masks, take experimental vaccines, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

8.     The defendant admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease. The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees. No provision exists in the policy to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

9.     The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population.   The defendant's "Covid-19 Policy" imposed these measures upon all of its workers without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

10.    Likewise, no provisions are in place which authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is voluntary.

11.    In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism. Thus the policy also relies upon the voluntary compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-job-related medical inquiries or treatments. A voluntary policy is not a legitimate requirement and cannot trigger compulsory termination.

12.    One of the mitigation measures established by the defendant's "Covid-19 Policy" is a vaccination mandate. On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no request for exemption.

13.    The defendant's policy treated the third group of employees (as opposed to the other employees that complied with the "Covid-19 Policy" or exempted themselves from it) either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or suppressed immune system that made them prone to contracting "Covid-19". The policy regarded them as disabled with a contagious disease with an impaired immune system.

**14.**     It should also be noted that the policy fails to provide any provisions or guidance for employers to remain compliant with the ADA when they started implementing the new "Covid-19 Policy". This is a major flaw of the "Covid-19 Policy" and one which this case seeks to redress.

**15.**     The policy has no provisions or guidance that instructs the employer on the practice of conducting an individualized assessment[1] once an employee refuses any of the accommodations offered by the policy (such as mask-wearing or experimental vaccinations).

**16.**     The policy fails to outline the process for an employer to follow if it wants to claim an exemption to it's duties under the ADA.

**17.**     The policy fails to provide guidance on the manner in which defendant could establish, by financial records, that it would suffer an undue financial burden for an employee's refusal, and it fails to provide guidance on how the plaintiff would document that an employee's refusal would fundamentally alter defendant's normal operations.

**18.**     The policy fails to describe how any provision of the policy is directly related to any single employee's essential job function.

**19.**     The policy also fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee, including the plaintiff.

**20.**     The policy failed to include guidance on how to process employees exceptions to the policy under the ADA.   The plaintiff is not limited only to the two "accommodations" defendant refers to as a "religious exemption" or a "medical exemption".

**21.**     The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in 29 CFR Part 1630.2 (o) because the "exemptions" offered are not job-related adjustments to the workplace environment.

---

[1]   29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**22.** Any employee may refuse any accommodation under 29 CFR Part 1630.9(d) if the defendant does not have a *bona fide* exemption or exception from its legal duties under the ADA.

**23.** The plaintiff may refuse any or all accommodations regarding the "Covid-19 Policy" because the policy is not related to his essential job function which is the reason the job exists.

**24.** The policy also asked representatives of the defendant to make repeated, non-job-related medical inquiries of employees and to impose non-job-related medical treatments on them. It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's. Medical decisions are far beyond the scope of the employer-employee relationship.

**25.** The plaintiff took exception to the policy partly because the practices were unrelated to the performance of his essential job functions[2]. The policy, as mentioned previously, lacked enforceability, and rather than allow employees to make their own medical decisions, the defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" employees, such as the plaintiff.

**26.** When the plaintiff, as a qualified individual, exercised his right under the ADA to refuse the accommodations imposed by the "Covid-19 Policy" and gave notice that the policy discriminated against him by perceiving him as having an un-assessed disability, the defendant denied him equal access to the premises and continued to impose these unrequested accommodations.

**27.** The defendant also retaliated against the plaintiff by interfering with his rights, imposing punitive measures including denying him an adequate exemption for sincerely held beliefs and selectively honoring them, harassing him to accept meetings to verbally discuss accommodations, constantly asking him to provide private and confidential medical information such as body temperature and "vaccination status", considering him as a "direct threat" to his coworkers, and thus creating a hostile work environment, imposing discriminatory "accommodations", isolating him from other employees, changing his

2 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ....the reason the position exists is to perform that function."

schedule into inconvenient hours, scheduling meetings and preventing his ADA advocate from attending them, prohibiting him from entering the defendant's facilities and preventing him from performing his job, forcing him to use his vacation days and to take unpaid leaves of absence, and ultimately firing him, actions which were directly and proximately caused by his good faith refusal to participate in the defendant's "Covid-19 Policy".

## STATEMENTS OF FACT

**28.**   Plaintiff worked for California Water Service as a treatment plant operator since October 1999.

**29.**   On August 9, 2021, plaintiff wrote to Human Resources Director LaKeisha Robottom to request a religious exemption from his employer's "Covid-19 Policy". His sincerely held religious beliefs did not allow him to cover his face. They also impeded plaintiff from subjecting his body to medical experimentation and "Covid-19" tests and vaccines are experimental health measures that can be harmful. In addition to his religious rights, plaintiff affirmed his privacy rights, which could not be suspended by emergency health measures related to a pandemic, executive orders, employment or business policies, rules, recommendations, regulations, guidelines, directives. Plaintiff pointed out that no statute or law had been passed by Congress that gave his employer an exemption to impinge on his rights. Further, plaintiff stated that there was no evidence that he was carrying an infectious disease or was a "direct threat" to others.

**30.**   Throughout the process of reviewing plaintiff's petition of a religious exemption, his employer's representatives hounded him to schedule meetings to verbally discuss possible accommodations. Plaintiff constantly refused because he was advised to document the negotiations in writing and was weary that these potential meetings were opportunities for them to coerce him into complying with his employer's "Covid-19 Policy."

**31.**   On August 22, 2021, Human Resources Director LaKeisha Robottom sent plaintiff an email stating that, as he had not yet provided the company with proof of him being vaccinated, they were required to treat him as though he was not vaccinated. At this moment, plaintiff's employer made a record of his vaccination record and of his disability without an individualized assessment from a licensed medical professional. Ms. Robottom informed plaintiff that his employer could accommodate his request to be exempt of wearing

a mask only when he was working alone or not in close proximity of other employees. When plaintiff was not alone, he was required to wear a mask.

**32.**   Ms. Robottom specified that the masking requirement had been put in place to safeguard employees from the spread of "Covid-19" and was in line with Cal/OSHA and CDC Guidelines.

**33.**   She stated that the company would experience an undue hardship by allowing plaintiff not to wear a mask, as it would "compromise workplace safety" and could potentially require a deviation from the Collective Bargaining Agreement between California Water Service and Local 205 of the Utility Workers Union of America.

**34.**   Ms. Robottom failed to include any supporting facts regarding her undue hardship claim.

**35.**   On August 31, 2021, plaintiff sent an email to Ms. Robottom with some suggested solutions to accommodate his religious beliefs. Plaintiff pointed out that his refusal to wearing a face mask, which was protected by law as a part of one's religious dress practice, was not grounds for exclusion from the workplace, since there was no proof that he was a threat to the safety of others with his bare face. Therefore, accommodations were rather easy, since they required that plaintiff just show up to work without a mask and perform his job as he normally did. Plaintiff also suggested that his supervisor, Gary Witcher, could change the schedule to accommodate his religious exemption, which was a common practice when employees needed days off, took vacation days or changed shifts.

**36.**   On September 15, 2021, Human Resources Director LaKeisha Robottom offered plaintiff a "temporary accommodation" via email. She suggested his schedule be temporarily changed to Friday through Monday. Supposedly, this ensured plaintiff would be able to work alone and without a mask for 24 of the 40 hours per week. She stated that plaintiff would need to work with his manager on Mondays and Fridays to determine if the workload demands and staff available allowed for assessments that would not require him to wear a mask, due to the nature of his job responsibilities. They also suggested plaintiff used his vacation or floater holidays on the days he was assigned to work with others and, if plaintiff did not have vacation or floaters, he could use unpaid leave time.

**37.** On September 25, 2021, plaintiff responded to Ms. Robottom's email. He stated that the offered accommodation was unfavorable and constituted discrimination, because it was based on his employer considering him as a "direct threat" to his co-workers without any individualized assessment. This in turn created an offensive and hostile work environment.

**38.** Furthermore, plaintiff stated that offering him to take vacation, floaters and unpaid leave of absence twice a week fell under retaliation and was illegal. Plaintiff informed Ms. Robottom that they have left him no choice but to file a formal complaint with the EEOC and the state agency for civil rights.

**39.** On September 28, 2021, Human Resources Director LaKeisha Robottom replied to plaintiff's email. She stated that it was unfortunate that he had not "reasonably cooperated" in the process of defining possible accommodations.

**40.** On October 28, 2021, plaintiff wrote back to Ms. Robottom. He repeated that there was no court order of quarantine or isolation nor medical evidence that he was a "direct threat."

**41.** Plaintiff's employer had no proof that if plaintiff was not wearing a mask, he would be a threat to the safety of anyone else. Therefore, it was defamation to continuously assume plaintiff was carrying a contagious disease. The assumption could not be made on a stereotype or generalization such as, "all non-mask wearers can infect other people." Since there was zero evidence that the coronavirus was spread by plaintiff, his employer continuously stating that it was concerned about the safety of others could be construed as unlawful harassment and intimidation.

**42.** Furthermore, plaintiff pointed out that his employer was prohibited from creating a hostile work environment and retaliating against him or treating him any differently than others. Segregation, separation, demotion or unreasonable work reassignment could be construed as unlawful discrimination.

**43.** Plaintiff informed Ms. Robottom that if he agreed to his accommodation of working weekends only and to avoid being around others on Fridays and Mondays was illegal, as was suggesting that plaintiff take time off work without pay, or vacation, or floater days.

**44.** The solutions proposed by his employer were not reasonable nor legal accommodations, but unreasonable and discriminatory. Plaintiff also stated that a legal religious accommodation entailed that his beliefs were honored at all times. So therefore, a reasonable, legal accommodation would be for plaintiff to come to work without a mask regardless of who he was around.

**45.** On April 28, 2022, plaintiff's ADA advocate sent an email to the EEOC and his employer stating that his petition for a religious exemption was erroneously made based upon advice given in bad faith by his employer, and actually, the matter involved disability discrimination and retaliation in violation of Title I of the ADA. Therefore, he amended his complaint.

**46.** Plaintiff's advocate stated that his employer's "Covid-19 Policy" was regarding him as having or potentially having a contagious disease, which was a disability as defined by the ADA. He also stated that the ADA prohibited employers from imposing any accommodations (i.e. "Covid-19" policies) upon employees unless they meet the criteria for establishing that the employee was a direct threat following an individualized assessment (diagnosis). He also pointed out that his employer was prohibited by law from requiring any medical examination in this process as it was an accommodation for which plaintiff must have been advised that plaintiff had the right to refuse.

**47.** Plaintiff's ADA advocate informed his employer that he was a qualified individual with a disability, and plaintiff was regarded by its "Covid-19 Policy" as having a disability that was other than transitory and minor. He mentioned that plaintiff's employer made a record of such disability by mis-classifying him as having a physical or mental impairment that substantially limited his ability to engage in one or more major life activities. Plaintiff's ADA advocate stated that plaintiff's employer's illegal policies were an impairment or disability for him because plaintiff had been prevented from doing his job unless plaintiff agreed to comply with the policies, even though they were not job related. He also stated that under the ADA, plaintiff was not required to discuss the nature of such disability nor to request reasonable modifications of such policy. Plaintiff was also not required to accept any accommodations unless his employer conducted an individualized assessment and then determined that he was a direct threat.

**48.**     Plaintiff's ADA advocate requested a copy of the records his employer relied upon to determine that plaintiff was a direct threat and that the accommodations it offered had the appropriate medical necessity and efficacy. He also requested evidence of financial responsibility establishing that first, plaintiff's employer had an insurable risk or legal duty of care to protect its employees from such contagious disease, and second, that his employer was insured against any adverse health consequences an employee might suffer as a result of accepting its accommodations since these are not being administered under the supervision of any licensed physician and do not consider the prior medical history or any contra-indications.

**49.**     On May 23, 2022, plaintiff's supervisor Gary Witcher called him to tell him to expect a company email for a meeting to discuss him not reporting his temperature to the company and that the meeting would take place on May 25, 2022. Then around 30 minutes later, plaintiff's supervisor called him again stating that the meeting would be in half an hour instead of Wednesday the 25th. Plaintiff knew this was a strategy to prevent his ADA advocate to be present in the meeting.

**50.**     On May 26, 2022, plaintiff wrote an email to Lynne McGhee, his employer's general counsel, to inform her that he was being threatened and intimidated. Plaintiff stated that the meeting that took place the day before was not scheduled or conducted in good faith, but only to give the appearance that his employer attempted to engage in "meaningful discussion" when in fact, the purpose was to intimidate him into submitting to his employer's discriminatory "Covid-19 Policy". Plaintiff pointed out that said policy conflicted with his employer's own code of ethics and anti-discrimination provisions.

**51.**     Furthermore, plaintiff stated that his employer was ignoring his notice of discrimination on the basis of disability.

**52.**     On May 30, 2022, plaintiff filed an amended complaint against his employer for discrimination and retaliation against him based upon disability with the EEOC.

**53.**     On June 2, 2022, plaintiff received a company email from LaKeisha Robottom, HR Director that stated that since plaintiff would not comply with the company's policy of logging his temperature along with other medical information at the start of his shift, he would not be allowed to work. She informed plaintiff that the company had placed him on "leave of

absence", and they were going to use his banked vacation time for the processing of his regular paychecks. Upon exhaustion of this bank, his leave would be transferred to an "unpaid leave" status. She stated that if plaintiff changed his mind, his employer was still willing to let him return to work.

**54.** On June 9, 2022, plaintiff showed up to his workplace. Plaintiff was ordered to leave by his supervisor Gary Witcher and Ms. Robottom, Human Resources Director. He was told that refusal to leave his employer's facilities would be considered insubordination and would subject him to disciplinary action. Plaintiff's employer called the police and he left the premises before they arrived.

**55.** On June 13, 2022, plaintiff received a termination letter. His employer stated that his refusal to comply with repeated directives from management regarding his employer's "Covid-19 Policy" constituted continuous insubordination and misconduct and were the cause of his termination.

**56.** A true and correct copy of all written communications are attached in Exhibit A.

### COUNT I. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA AS AMENDED

**57.** Plaintiff re-alleges each of the foregoing statements and those in his affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

**58.** The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

**59.** Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, the plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon the defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

**60.** The plaintiff belongs to a minority of employees claiming to being regarded as having a disability by the "Covid-19 Policy".

**61.** The plaintiff was obviously qualified for a job he was already doing, and he was willing to the job.

**62.** Despite the plaintiff's qualifications, the plaintiff was denied equal access and was terminated.

**63.** The defendant's implementation of the "Covid-19 Policy" was a direct and proximate cause of the defendant's decision to terminate plaintiff's employment and there was no other reason to terminate plaintiff's employment.

**64.** This is a case of "first impression" because the plaintiff has exercised his rights to medical privacy and informed consent to refuse the "Covid-19 Policy's" medical treatments. These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d) for the reason that these rights are <u>intangible private property rights of people</u>, and of the plaintiff specifically, and are protected by law and are not originated or granted by any statute. These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.  Plaintiff asks the question how can the "Covid-19 Policy" which is not authorized by any statute overcome established rights that form the bedrock of modern society?

**65.** This is also a case of "first impression" because the plaintiff, in using the ADA to protect his rights,  has asked the question: how did the defendant suddenly acquire a new legal authority or legal duty to treat the plaintiff, its employee, for a disease without any medical examination or diagnosis? The answer of course is that the defendant never did acquire any such legal duty or authority.

**66.** This is also a case of "first impression" because, while the defendant makes the noble-sounding but disingenuous claim that their "Covid-19 Policy" is intended to prevent the spread of "Covid-19", it has absolutely no financial responsibility to engage in or administer such a policy. In fact, employers may adopt a "Covid-19 Policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

**67.** This case, for the first time, requires answers for the following questions: (1) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with "Covid-19" after complying with their "Covid-19 Policy"?; (2) Does the defendant have proof of any financial responsibility (insurance, etc.) to

compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy"?

**68.** This is additionally a case of "first impression" because, if the defendant actually had the novel and *bona fide* legal right to require the plaintiff to disclose his medical records, then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and request such records directly from the physician. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

**69.** Finally, it must be noted that an "exceptional condition" exists with this case which must be acknowledged. If the United States District Court itself has adopted the same policies as the defendant, can the court be impartial?

**70.** The defendant's "Covid-19 Policy" is a failed policy because it does not include several necessary provisions.

**71.** It has no provisions for remaining compliant with disability law or addressing the needs of employees with disabilities.

**72.** It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

**73.** It lacks any authorized enforcement provisions and relies either on the plaintiff to voluntarily waive his rights to medical privacy, informed consent, and rights protected under the ADA **or** upon the defendant's willingness to force submission to the policy in exchange for disaster funding.

**74.** The policy fails to provide any advice or instruction on how to conduct any individualized assessment[3].

**75.** For those employees claiming rights under the ADA, the policy fails to identify that an ADA representative of the defendant will be necessary to oversee that the policy remains in compliance.

---

3   29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**76.**    In fact, the defendant's "Covid-19 Policy" completely ignores all legal duties to aid and encourage those with disabilities under the ADA.

**77.**    The defendant's "Covid-19 Policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "vaccinated" and those who are "unvaccinated" and treating them differently.

**78.**    The policy identifies one group of employees who claim to be exempted from the policy for medical or religious reasons but ignores the group of employees who invoke their rights under the ADA and are in a protected class.

**79.**    The defendant presumes that it "somehow" acquired the legal duty and legal authority to cure or treat the un-assessed disability by imposing the policy measures upon the plaintiff.

**80.**    The defendant claims that its "Covid-19 Policy" is a legitimate requirement, which authorizes termination for non-compliance, yet the defendant fails to act under any legal authority or legal duty to impose its policy measures on employees.  Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory or legitimate.

**81.**    The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as "Covid-19".

**82.**    Although the plaintiff is not required by law to discuss the nature of an un-assessed disability he was assumed to have, for clarity's sake he alleges that the defendant's policy rested on the assumption that every employee, the plaintiff included, had or could have this disease. That is, the policy's underlying assumption was that all of its employees were simultaneously at risk and also posed a risk to the health of all other employees.

**83.**    It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of "Covid-19".  The defendant's "Covid-19 Policy" regarded the plaintiff as having "Covid-19" or being prone to getting infected with "Covid-19". All mitigation measures flowed from this premise; but the defendant terminated the plaintiff for not disclosing his medical information and for not participating in defendant's non-job-related medical examinations.

**84.**     It is not necessary to allege that the defendant's agents personally regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose the policy's provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that he was infected or may in the future become infected with a deadly, contagious disease (e.g. "Covid-19").

### NON-JOB RELATED MEDICAL INQUIRIES

**85.**     The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**86.**     The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

**87.**     The defendant's "Covid-19 Policy" imposed certain non-job-related medical inquiries ("accommodations") on the plaintiff including, but not limited to: disclosing private medical records and medical history; and disclosing vital statistics, like body temperature, which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

**88.**     The defendant's "Covid-19 Policy" imposed submitting to medical tests[4] which are a diagnostic tool of physicians but are not a diagnosis in and of themselves. This practice results in the absurd situation of relying upon a lay-man's "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

**89.**     The defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace.  The defendant's "Covid-19 Policy" imposed certain non-job-related medical treatments including, but not limited to: taking experimental vaccines;  wearing a surgical mask over the face; engaging in "social distancing" which is a euphemism for quarantine and isolation.

**90.**     These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related; in addition the defendant is trespassing on the plaintiff's medical privacy rights, both of these issues are expressed in the ADA.

---

4   "Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

91.     In addition, if a vaccine prevents infection and transmission of a disease as defined by modern scientific standards, why would anyone need to take a vaccine so that someone else could avoid becoming ill? A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

92.     The "vaccines" demanded by the defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental vaccines have been <u>approved</u> by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase. The only "vaccine" that is FDA-<u>approved</u>, Comirnaty, is not commercially available, should the plaintiff choose to take it.

93.     The "Covid-19 Policy" as implemented by the defendant allowed un-skilled and unlicensed individuals to impose medical interventions upon employees because commentary on a website stated that such interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice (e.g., CDC[5], EEOC[6], etc.).

94.     The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which these medical treatments and medical inquiries were related to his essential job function. In fact, none of the accommodations were related to the plaintiff's essential job function because he was able to continue performing his essential employment duties without participating in the defendant's "Covid-19 Policy".

95.     The plaintiff also alleged in his testimony and in written communications[7] that he was both willing and able to continue performing his employment duties and that the defendant's "Covid-19 Policy" was not related in any way to his essential job functions and that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

**MEDICAL PRIVACY**

---

5 https://www.cdc.gov/other/disclaimer.html
6 https://www.eeoc.gov/disclaimer
7 A true and correct copy of which is alleged as Exhibit A.

**96.** Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[8] testing history) without any regard to confidentiality. The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

**97.** The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[9] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

**98.** The defendant's policy does however require employees to obtain a physician's note if they are claiming some exemption to the policy for religious or medical reasons.

**99.** Ironically, the defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform his essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

**100.** The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

### MEDICAL AND RELIGIOUS EXEMPTIONS

**101.** The plaintiff is not required to request exemptions from the defendant's "Covid-19 Policy" for religious or medical reasons and in fact, is not required to request any accommodations or reasonable modifications regarding such policy because none of its provisions are related to his essential job function.

**102.** Therefore the plaintiff had no duty to request any reasonable modification or accommodation to the defendant's "Covid-19 Policy"; however, the plaintiff was deceptively informed that he could request a "religious or medical exemption".

**103.** The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in 29 CFR Part 1630.2 (o)

---

8 Polymerase Chain Reaction

9"Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

because the "exemptions" offered are not job-related adjustments to the workplace environment.

**104.** The defendant's policy did not impose any new legal duties upon the plaintiff from which he could have been exempted or needed to request exemption from.

**105.** In fact this deceptive practice was only intended to give the appearance of fairness while the defendant could deny or revoke exemptions as it suited the defendant. The defendant never disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which the plaintiff was being "exempted".

**106.** The plaintiff is not required to discuss the nature of an un-assessed disability he is "assumed" to have; nor is he required to request any "reasonable modifications", for an un-assessed disability he is assumed to have.

**107.** In actuality, the plaintiff was always protected under the ADA once he opposed the policy. He is not required to use the language of the ADA to claim this protection, however the plaintiff did specifically give notice to the defendant that he was a qualified individual who was being regarded as having a disability by the defendant's policy.

### ABSENCE OF AN INDIVIDUAL ASSESSMENT

**108.** The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

**109.** The defendant simply punished the plaintiff for his refusal on the pure speculation that the plaintiff had a disability known as "Covid-19", or on the pure speculation that someday he might have such a disease, and on the false premise that the defendant had the legal duty and authority to protect him and everyone else from contracting such a disease (disability).

**110.** Claiming that the plaintiff had a deadly contagious disease, or that he might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d).

**111.** The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

**112.** The "Covid-19 Policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

**113.** Is it rational to regard oneself and others as having an illness without any diagnosis, and then seek to treat everyone with the same medical intervention without any diagnosis? This behavior is defined as a mental illness in the Fifth Edition of the <u>Diagnostic and Statistical Manual for Mental Health</u>.[10] The "Covid-19 Policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

### RECORD OF A DISABILITY

**114.** The plaintiff is also entitled to the protections established in the ADA under the third prong which establishes coverage when others make a "record of" an individual's disability.

**115.** The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease and simultaneously assume that they are impaired by a suppressed or weak immune system or respiratory system that makes them vulnerable to "Covid-19".

**116.** The defendant <u>made a record of the impairment its policy is intended to treat</u>, by documenting plaintiff's "vaccination status" (even though plaintiff refused to disclose his medical records) and via its communication, attitude and treatment of the plaintiff.

**117.** The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

**118.** The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying him as needing to wear a mask and self-test which led to defendant denying plaintiff an adequate exemption for sincerely held beliefs and selectively honoring them; harassing him to accept meetings to verbally discuss accommodations; constantly asking him to provide private and confidential medical

10  Factitious Disorder or Munchhausen Syndrome by Proxy.

information such as body temperature and "vaccination status"; considering him as a "direct threat" to his coworkers, and thus creating a hostile work environment; imposing discriminatory "accommodations"; isolating him from other employees; changing his schedule into inconvenient hours; scheduling meetings and preventing his ADA advocate from attending them; prohibiting him from entering the defendant's facilities and preventing him from performing his job; forcing him to use his vacation days and to take unpaid leaves of absence, and ultimately firing him. Thus, defendant caused plaintiff to suffer loss of income and employment opportunities.

**119.** The mitigation measures imposed by defendant's "Covid-19 Policy" also create physical impairments that substantially limit the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

**120.** The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's "record of" disability prong.

### PROTECTION UNDER THE ADA

**121.** The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

**122.** Upon giving the defendant notice that he was regarded as having a disability,[11] the plaintiff identified himself as being within a protected group; upon claiming his rights to refuse the defendant's accommodations based upon his good faith opposition, he engaged in a protected activity.

**123.** The defendant applied the policy to everyone equally and failed to recognize that the plaintiff (1) opposed the policy, (2) gave notice of being regarded as having a disability, (3) objected to submitting to the defendant's "accommodations", and (4) was within a protected class and engaged in a protected activity.

**124.** The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. As an analogy: consider a defendant

11 As a current employee he is, of course, understood to be a "qualified individual".

requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because *everyone is required to use the stairs and the policy is applied equally to everyone*. It is clear that this is an erroneous conclusion that does not allow disability rights.

### ABSENCE OF AN ADA EXEMPTION FOR EMPLOYER

**125.** Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

**126.** The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

**127.** The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered their normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter their normal operations.

**128.** The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**129.** The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

**130.** The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor. If the disability is **both** transitory **and** minor, such as having the common cold, then why the need for this draconian policy and all?

**131.** There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation.  The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order

obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

**132.**   To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

**133.**   The plaintiff's allegations easily satisfy the elements of discrimination by showing that he falls within a protected group, that he is qualified for the position he held, that he was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**134.**   The plaintiff demands a jury trial.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

## COUNT II. COMPLAINT FOR RETALIATION IN VIOLATION OF THE ADA AS AMENDED IN 2008

**135.**   The plaintiff sues the defendant for retaliation in violation of the ADA and the ADA-AA.

**136.**   The plaintiff re-alleges the foregoing statements of fact and allegations from his complaint for discrimination in Count I along with his affidavit, and further alleges the following.

**137.**   Upon giving defendant notice that he was regarded as having a disability and that he was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures and adverse employment actions, upon him for his good faith refusal to participate in the defendant's offered accommodations.

**138.** The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive his rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**139.** The defendant implemented a policy which regarded the plaintiff as disabled because of the plaintiff's unvaccinated status and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**140.** The defendant admits that refusing to disclose the plaintiff's "vaccination status" (i.e. medical records) would directly and causally result in the plaintiff's contract being either terminated or not renewed.

**141.** Beginning from the moment he gave such notice to the defendant, the plaintiff suffered adverse employment actions[12] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff. Defendant ignored and denied his claim of disability, reprimanded him, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and finally, terminated his employment as alleged in his affidavit.

**142.** Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying his rights under the ADA, specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**143.** The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**144.** The defendant's "Covid-19 Policy" classified the plaintiff in such a way that his employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do his job without first submitting to defendant's accommodations ("mitigation measures").

**145.** The defendant proceeded to deny plaintiff an adequate exemption for sincerely held beliefs and selectively honoring them; harass him to accept meetings to verbally discuss

12 Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.

accommodations; constantly ask him to provide private and confidential medical information such as body temperature and "vaccination status"; consider him as a "direct threat" to his coworkers, and thus it created a hostile work environment; impose discriminatory "accommodations"; isolate him from other employees; change his schedule into inconvenient hours; schedule meetings and preventing his ADA advocate from attending them; prohibit him from entering the defendant's facilities and prevent him from performing his job; force him to use his vacation days and to take unpaid leaves of absence, and ultimately fire him, actions that causally resulted in the plaintiff's loss of assignment (job opportunities) and income.

**146.** The plaintiff exercised his right to refuse the defendant's "Covid-19 Policy" measures based upon a good faith belief that the policy did not apply to him because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**147.** Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because he had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**148.** The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the policy was not related in any way to his essential job function.

**149.** The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to his essential job function.

**150.** The defendant imposed pecuniary measures and other adverse employment actions upon plaintiff which included the loss or threatened loss of pay, isolation, segregation, diminished employment responsibilities, interference with his rights as alleged in his affidavit.

**151.** Each time the plaintiff exercised his right to refuse the defendant's accommodations,he did so in good faith, and the defendant subsequently, in a manner that

was causally-related to the exercise of such right, imposed adverse employment actions upon the plaintiff for no necessary reasons other than to deter him and punish him for exercising his rights.

**152.** The defendant imposed adverse employment actions upon the plaintiff which included, isolation and segregation, or sending him home so that he could not perform his essential job functions.

**153.** The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of it's "Covid-19 Policy".

**154.** These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which he was able to do his job and interact with co-workers by substantially impairing his ability to perform his essential employment duties.

**155.** The "Covid-19 Policy" is technically voluntary and yet the defendant imposed pecuniary measures and other adverse employment actions as a direct and proximate cause of the plaintiff's good faith refusal to participate or accept the provisions of the policy.

**156.** Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations, and each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**157.** Each adverse employment action took place within moments of, or in direct response to, plaintiff's expression of his good faith refusal to comply with the defendant's policy.

**158.** These facts demonstrate the defendant's adverse employment actions derived from the "Covid-19 Policy" and defendant' failure to comply with the ADA.

**159.** This constituted a materially adverse change in the terms and conditions of employment. Before the policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the

defendant's adoption of its "Covid-19 Policy", all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of his right to refuse.

**160.**   These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties. These changes included (actual or likely) termination of employment, isolation, demotion, decrease in wages and loss of benefits and were each causally-related to each time the plaintiff chose to exercise and enjoy his rights under the ADA.

**161.**   Ultimately, the defendant did terminate the plaintiff's employment as a direct and proximate cause of his refusal to participate in the defendant's "Covid-19 Policy".

**162.**   The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy". The defendant was aware of plaintiff refusal from the very moment he expressed that he was regarded as having a disability and began refusing to participate in the policy.

**163.**   Each time the defendant approached the plaintiff with a demand or request to submit to the terms of the "Covid-19 Policy", the defendant informed the plaintiff that he  hewould be penalized, such as the plaintiff has previously alleged.

**164.**   Each time the plaintiff exercised his right to refuse, the defendant undertook adverse employment actions against the plaintiff as previously alleged, and in each instance, such measures were causally related to the incident of refusing the policy and suffering penalties or pecuniary measures imposed by the defendant and each of these are detailed in the foregoing allegations.

**165.**   The plaintiff demands a jury trial.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-

judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this _18_ day of October, 2022.

Philip A. Koch
Plaintiff in *propria persona*

Philip A. Koch
Plaintiff *in Propria Persona*
10707 Fieldstone Dr.
Bakersfield, CA 93306
(661) 401-3818
norgesvike@gmail.com

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA
510 19th Street, Bakersfield, CA 93301

PHILIP A. KOCH
PLAINTIFF

v.                                        CASE NO. _____

CALIFORNIA WATER SERVICE COMPANY
DEFENDANT
_____/

### AFFIDAVIT IN SUPPORT OF COMPLAINT

STATE OF CALIFORNIA       )
                          )         ss
COUNTY OF KERN            )

**1.**    I, Philip A. Koch, do hereby solemnly affirm that the statements herein are true and correct in substance and in fact and that I have personal knowledge of each.

**2.**    I have been harassed at my job, discriminated and retaliated against based on disability for refusing to accept my employer's accommodations for regarding me as impaired in my immune system and impaired in my respiratory system.

**3.**    I am absent and without evidence of any information from any health officer identifying myself as having any communicable disease or having been exposed to any toxic substance.

**4.**    I am absent and without knowledge of any evidence or court order, obtained by any petition of the Department of Health or a public health officer, that was based upon any physician's affidavit in which I have been identified as having any communicable disease or having been exposed to any toxic substance.

**5.**     I am absent and without knowledge of any evidence of any court order determining that I am or have been a direct threat to anyone.

**6.**     I am absent and without knowledge of any evidence of any individualized assessment required by law that has determined that I am or have been a direct threat to anyone.

**7.**     I am absent and without knowledge of any evidence of any court order imposing any terms of isolation or quarantine or other measures upon myself.

**8.**     I have previously and timely disclosed and duly noticed the defendant of a disability I am regarded as having and that the assertions made in the complaint are true and correct to the best of my knowledge, information and belief.

**9.**     I understand that I have the right to make my own health choices and that no law has been suspended regarding my right to Informed Consent during this time and I have not been diagnosed with an infectious disease.

**10.**    I worked for California Water Service since October 1999.

**11.**    On August 9, 2021, I wrote to Human Resources Director LaKeisha Robottom to request a religious exemption from my employer's "Covid-19 Policy" **(Exhibit A-1)**. My sincerely held religious beliefs do not allow me to cover my face. They also impede me from subjecting my body to medical experimentation and "Covid-19" tests and vaccines are experimental health measures that can be harmful to my body. In addition to my religious rights, I affirmed my privacy rights, which could not be suspended by emergency health measures related to a pandemic, executive orders, employment or business policies, rules, recommendations, regulations, guidelines, directives. I pointed out that no statute or law had been passed by Congress that gave my employer an exemption to impinge on my rights. Further, I stated that there was no evidence that I was carrying an infectious disease or was a "direct threat" to others.

**12.**    Throughout the process of reviewing my petition of a religious exemption, my employer's representatives hounded me to schedule meetings to verbally discuss possible accommodations. I constantly refused because I was advised to document the negotiations in writing and I was weary that these potential meetings were opportunities for them to coerce me into complying with my employer's "Covid-19 Policy."

**13.**    On August 22, 2021, Human Resources Director LaKeisha Robottom sent me an email **(Exhibit A-2)** stating that, as I had not yet provided the company with proof of my being vaccinated, they were required to treat me as though I was not vaccinated. She informed me that my employer could accommodate my request to be exempt of wearing a mask only when I was working alone or not in close proximity of other employees. When I was not alone, I was required to wear a mask.

**14.**    Ms. Robottom specified that the masking requirement had been put in place to safeguard employees from the spread of "Covid-19" and was in line with Cal/OSHA and CDC Guidelines. She stated that the company would experience an undue hardship by allowing me not to wear a mask, as it would "compromise workplace safety" and could potentially require a deviation from the Collective Bargaining Agreement between California Water Service and Local 205 of the Utility Workers Union of America.

**15.**    On August 31, 2021, I sent an email to Ms. Robottom with some suggested solutions to accommodate my religious beliefs **(Exhibit A-3)**. I pointed out that my not wearing a face mask, which was protected by law as a part of one's religious dress practice, was not grounds for exclusion from the workplace, since there was no proof that I was a threat to the safety of others with my bare face. Therefore accommodations were rather easy, since they required that I just show up to work without a mask and perform my job as I normally did. I also suggested that my supervisor, Gary Witcher, could change the schedule to accommodate my religious exemption, which was a common practice when employees needed days off, took vacation days or changed shifts.

**16.**    On September 15, 2021, Human Resources Director LaKeisha Robottom offered me a "temporary accommodation" via email **(Exhibit A-4)**. She suggested my schedule be temporarily changed to Friday through Monday. Supposedly, this ensured I would be able to work alone and without a mask for 24 of the 40 hours per week. She stated that I would need to work with my manager on Mondays and Fridays to determine if the workload demands and staff available allowed for assessments that would not require me to wear a mask, due to the nature of my job responsibilities. They also suggested I used my vacation or floater holidays on the days I was assigned to work with others and, if I did not have vacation or floaters, I could use unpaid leave time.

**17.**    On September 25, 2021, I responded to Ms. Robottom's email **(Exhibit A-5)**. I stated that the offered accommodation was unfavorable and constituted discrimination, because it

was based on my employer considering me as a "direct threat" to my co-workers. This in turn created an offensive and hostile work environment. Furthermore, I stated that offering me to take vacation, floaters and unpaid leave of absence twice a week fell under retaliation and was illegal. I informed Ms. Robottom that they have left me no choice but to file a formal complaint with the EEOC and the state agency for civil rights.

**18.**     On September 28, 2021, Human Resources Director LaKeisha Robottom replied to my email **(Exhibit A-6)**. She stated that it was unfortunate that I had not "reasonably cooperated" in the process of defining possible accommodations.

**19.**     On October 28, 2021, I wrote back to Ms. Robottom **(Exhibit A-7)**. I repeated that there was no court order of quarantine or isolation nor medical evidence that I was a "direct threat." My employer had no proof that if I was not wearing a mask that I would be a threat to the safety of anyone else. Therefore, it was defamation to continuously assume I was carrying a contagious disease. The assumption could not be made on a stereotype or generalization such as, "all non-mask wearers can infect other people." Since there was zero evidence that the coronavirus was spread by me, my employer continuously stating that it was concerned about the safety of others could be construed as unlawful harassment and intimidation.

**20.**     Furthermore, I pointed out that my employer was prohibited from creating a hostile work environment and retaliating against me or treating me any differently than others. Segregation, separation, demotion or unreasonable work reassignment could be construed as unlawful discrimination. I informed Ms. Robottom that if I agreed to my accommodation of working weekends only and to avoid being around others on Fridays and Mondays was illegal, as was suggesting that I take time off work without pay, or vacation, or floater days. The solutions proposed by my employer were not reasonable nor legal accommodations, but unreasonable and discriminatory. I also stated that a legal religious accommodation entailed that my beliefs were honored at all times. So therefore, a reasonable, legal accommodation would be for me to come to work without a mask regardless of who I was around.

**21.**     On April 28, 2022, my ADA advocate sent an email to the EEOC and my employer **(Exhibit A-8)** stating that my petition for a religious exemption was erroneously made based upon advice given in bad faith by my employer, and actually, the matter involved disability discrimination and retaliation in violation of Title I of the ADA.

**22.**   The email stated that my employer's "Covid-19 Policy" was regarding me as having or potentially having a contagious disease, which is a disability as defined by the ADA. It also stated that the ADA prohibited employers from imposing any accommodations (i.e. "Covid-19" policies) upon employees unless they meet the criteria for establishing that the employee was a direct threat following an individualized assessment (diagnosis). It also pointed out that my employer was prohibited by law from requiring any medical examination in this process as it was an accommodation for which I must have been advised that I had the right to refuse.

**23.**   My employer was informed that I was a qualified individual with a disability, and I was regarded by its "Covid-19 Policy" as having a disability that is other than transitory and minor. The email mentioned that my employer made a record of such disability by mis-classifying me as having a physical or mental impairment that substantially limited my ability to engage in one or more major life activities. It stated that my employer's illegal policies were an impairment or disability for me because I had been prevented from doing my job unless I agreed to comply with the policies, even though they were not job related. It also stated that under the ADA I was not required to discuss the nature of such disability nor to request reasonable modifications of such policy. I was also not required to accept any accommodations unless my employer conducted an individualized assessment and then determined that I was a direct threat.

**24.**   My ADA advocate requested a copy of the records my employer relied upon to determine that I was a direct threat and that the accommodations it offered had the appropriate medical necessity and efficacy. He also requested evidence of financial responsibility establishing that first, my employer had an insurable risk or legal duty of care to protect its employees from such contagious disease, and second, that my employer was insured against any adverse health consequences an employee might suffer as a result of accepting its accommodations since these are not being administered under the supervision of any licensed physician and do not consider the prior medical history or any contra-indications.

**25.**   On May 23, 2022, my supervisor Gary Witcher called me telling me to be expecting a company email for a meeting to discuss me not reporting my temperature to the company and that the meeting would take place on May 25, 2022. Then around 30 minutes later, my supervisor called me again stating that the meeting would be in half an hour instead of

Wednesday the 25th. I know this was a strategy to prevent my ADA advocate to be present in the meeting.

**26.**     On May 26, 2022, I wrote an email to Lynne McGhee, my employer's general counsel, to inform her that I was being threatened and intimidated **(Exhibit A-9)**. I stated that the meeting that took place the day before was not scheduled or conducted in good faith, but only to give the appearance that my employer attempted to engage in "meaningful discussion" when in fact, the purpose was to intimidate me into submitting to my employer's discriminatory "Covid-19 Policy". I pointed out that said policy conflicted with my employer's own code of ethics and anti-discrimination provisions. Furthermore, I stated that my employer was ignoring my notice of discrimination on the basis of disability.

**27.**     On May 30, 2022, I filed an amended complaint against my employer for discrimination and retaliation against me based upon disability with the EEOC **(Exhibit A-10)**. My original inquiry case # is 480-2021-04331.

**28.**     On June 2, 2022, I received a company email from LaKeisha Robottom, HR Director that stated that since I would not comply with the company's policy of logging my temperature along with other medical information at the start of my shift, I would not be allowed to work. She informed me that the company had placed me on "leave of absence", and they were going to use my banked vacation time for the processing of my regular paychecks. Upon exhaustion of this bank, my leave would be transferred to an "unpaid leave" status. She stated that if I changed my mind, my employer was still willing to let me return to work **(Exhibit A-11)**.

**29.**     On June 9, 2022, I showed up to my workplace. I was ordered to leave by my supervisor Gary Witcher and Ms. Robottom, Human Resources Director. I was told that refusal to leave my employer's facilities would be considered insubordination and would subject me to disciplinary action. My employer called the police and I left the premises before they arrived.

**30.**   On June 13, 2022, I received a termination letter **(Exhibit A-12)**. My employer stated that my refusal to comply with repeated directives from management regarding my employer's "Covid-19 Policy" constituted continuous insubordination and misconduct and were the cause of my termination.

**31.**   The documents included with Exhibit A are true and correct copies of the originals.

*Philip A. Koch*
Philip A. Koch, Affiant

STATE OF CALIFORNIA         )
                            )     Ss
COUNTY OF KERN              )

Subscribed and Sworn to before me a notary public this __18__ day of October, 2022.

*See Below.*
Signature of Notary                           [ls]

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness accuracy or validity of that document.

---

State of CA      } SS
County of Kern
Subscribed and sworn to (or affirmed) before me
on this _18_ day of _October_ ,20 _22_ .
by _Philip A. Koch_
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

_____           Seal
Notary Public Signature



ELIZABETH NERI
COMM. #2280938
NOTARY PUBLIC • CALIFORNIA
KERN COUNTY
My Comm. Exp. Apr. 9, 2023

# EXHIBIT A

written communications

## (EXHIBIT A-1)

On August 9, 2021 I wrote my first letter to LaKeisha Robottom, I wrote:

Dear LaKeisha Robottom,

I am writing to request a religious exemption from covering my face with a mask, shield, or face covering of any kind. My sincerely held religious beliefs do not allow me to cover my face, as I am made in the image of God, and as an image-bearer of God, I must stand before him with my face unveiled.

The body is the temple of the Holy Spirit and as such, should not be used for medical experimentation. Further, the substances in the test and the vaccine are possibly harmful to the human body, and we are called to protect the body and not participate in pharmacopeia.

In other religions, people may wear a turban, a hat, wear a robe, even carry a knife as part of their religious expression, and this has been upheld by the Supreme Court many times. Sikh faith members for example, are able to retain their beards in the Army, even when the Army policies require a clean-shaven face. But the Sikh faith member is exempt from this requirement because his religious expression is protected by law.

My religious rights and my right to privacy are protected by the U.S. Constitution and the Constitution of this State. Religious creed includes my dress and my grooming practices – including what I put on my head or face – as a part of my religious expression. Wearing a mask is an affront to my Christian beliefs and I cannot go against God's law in covering my face. Further, there is no evidence that I am carrying an infectious disease, so the defense of me being a "direct threat" has not been established and is therefore not valid. A licensed medical doctor who has examined me would have to determine that I am a threat and since there is not court order of quarantine against me, there is no evidence I am a threat to others.

I am a Christian. I am not a Muslim. Muslims veil their faces, not Christians. Wearing a mask is

an affront to my Christian beliefs and I cannot go against God's law in covering my face. Further, there is no evidence that I am carrying an infectious disease, so I cannot be defined as a "direct threat" because this has not been established and is therefore not valid. A licensed medical doctor who has examined me would have to determine that I am a threat and since there is no court order of quarantine against me, there is no evidence that I am a threat to others.

The burden of proof to refuse to accommodate my sincerely held religious belief is set at a very strict standard. According to law, stereotypes and generalizations are not valid evidence. To say that I am a threat to the health and safety of others simply due to my bare face is akin to saying all Muslims are threats to the health and safety of others because they might be terrorists.
No emergency, pandemic, health orders, executive orders, employment or business policies, rules, recommendations, regulations, guidelines, directives, or measures suspend Constitutional rights. No statute of law has been passed by the U.S. Congress that gives an exemption to this facility to allow for my rights to be violated.
No president's orders supersede the Constitution. I look forward to your constitutionally valid reply.

Sincerely,

Philip A. Koch

CC:
U.S. Department of Justice, Civil Rights Division
EEOC, Civil Rights Division

# (EXHIBIT A-2)

On August 22, 2021, LaKeisha Robottom sent me an email stating such things as: that it is unfortunate that I no longer wanted to meet or cooperate with her because I asked for all correspondence to be in writing. She wrote: "As you have not yet provided the company with proof of your being vaccinated, we are required to treat you as though you are not vaccinated. Based on the information that has been provided, I'd like to inform you the company can accommodate your request to no wear a mask when you are working alone or if not in close proximity of another employee and not working alone, an approved mask will be required. This requirement has been in place to safeguard the spread of COVID 19 and its variants amongst our employees. We have determined we will experience an undue hardship by allowing you to not wear a mask as it compromises workplace safety and could potentially require a deviation from the Collective Bargaining Agreement between California Water

Service and Local 205 of the Utility Workers Union of America. We will continue to monitor the infectious rate, guidelines and data to continue to make the best decisions and business rules for the safety of employees and the communities we serve." In other words, considering me a "direct threat" without an individualized assessment from a doctor. She went on to state Cal/OSHA and CDC guidelines.

# (EXHIBIT A-3)

On August 31, 2021, I sent email to LaKeisha Robottom with some suggested solutions since she wasn't wanting to come up with any herself. I wrote:

Hello LaKeisha.

Before I give some additional solutions, some things need to be addressed in your letter dated August 25, 2021 to me.

A couple of times in your letter you state that there is a concern for the safety of others implying I would be a "direct threat." As already stated in my letter requesting a religious exemption I wrote, there is no evidence that I am carrying an infectious disease, so the defense of me being a "direct threat" has not been established and is therefore not valid. A licensed medical doctor who has examined me would have to determine that I am a threat and since there is not a court order of quarantine against me, there is no evidence I am a threat to others. Here is the legal definition of what a direct threat is:

DIRECT THREAT: Legal Definition

According to Title III of the U.S. Civil Rights Act, 36.208

In determining whether an individual poses a direct threat to the health and safety of others, a public accommodation must make an individualized assessment, based on reasonable judgement that relies on current medical knowledge or the best available objective evidence."

**Absent a court-order of quarantine or isolation,** there is no medical evidence that I am a threat to the health and safety of other California Water Service employees. **Innocent until proven guilty in the USA. Therefore, my right to equal access to the goods, services, privileges and facilities of this establishment is guaranteed by Title II, III and VII of the Civil Rights Act of 1964.**

It should also be noted that those who violate state and federal laws are committing a crime in denying the rights of the individual. One could actually be arrested for this crime and held personally liable for criminal and civil damages, including fines and jail time. That means people that violate one's rights can be

personally charged and arrested for this crime, regardless of what your manager, governor or health officer says. No law, store or company policy supersedes the Federal law.

Furthermore, in addition towards me seeking my lawfully protected right to seek a religious exemption I wanted to make the company aware of these additional laws that they are not upholding and probably are unaware that they exist.

**California Civil Code 43:** Protects the individual's right to be free from bodily harm (such as from masks, test and vaccines).

**California Civil Code 46:** It is a violation of personal rights to slander someone by imputing them with an infectious or loathsome disease.

As a courtesy, I have provided information where I explained my sincerely held religious beliefs and how CWS, as a private employer, is not exempt from upholding my Constitutionally protected rights.

Safety protocols do not trump one's rights. A person in a wheelchair, for example, may not be excluded from the workplace, even though that employee may pose a "risk" to the safety of others because the wheelchair is cumbersome, takes up more space than an able-bodied person, and person in a wheelchair can't move as quickly and nimbly as an able-bodied person. Accordingly, a Sikh employee wearing a turban, or a Muslim wearing a hijab, are not required to remove their headdress because their appearance may startle other employees or appear out of place in the workplace, perhaps distracting others and compromising workplace safety. Similarly, my not wearing a face covering, *which is protected by law as a part of one's religious dress practice*, is not grounds for exclusion from the workplace. There is *no proof* that I am a threat to the safety of others with my bare face.

You may state that my failing to adhere to required safety protocols is against CWS policies. However, CWS has no legal authority to set, implement and enforce policies that violate one's rights. Just as CWS cannot require employees to snort a line of cocaine for energy, remove their clothes for a "safety search", fistfight in the break room. CWS has no legal authority to require me (or anyone else) to violate my own religious beliefs. CWS has no legal authority to require Muslims to eat ham sandwiches or to require employees to receive Holy Communion. No company policy, health order, mandates, pandemic, emergency, or executive orders suspend one's rights.

Now if the company abides by federal law that I am not a "direct threat" to anybody as defined above. Then accommodations are rather easy; that means I just show up to work without a mask and do as I normally do. However, if the company ignores the direct threat federal law and treats me as though I am a threat to others at CWS, then accommodations become a little bit more difficult, yet still can be done without any due hardship to the company whatsoever. Of course, I would implore on you to do what is legally right and do not consider

me a "direct threat" (which is illegal if you do) but if you choose not to, like I already stated, accommodations still could be easily made.

Example: There are four qualified experienced operators at the water treatment plant that can be easily scheduled to accommodate the operator in training. It was very kind of Gary to give me kudos as being one who would give input in this training; however, it doesn't have to be me. Brandon Baxter took over Clay Suskin's job as another permanent operator. He was not fully trained by me, most of his training came from Clay and Hector and he got some input from Barbara and I after his training was over. So since I didn't participate in that training, it would be no harm in me not participating in the training of the operator in training. Therefore, accommodations can be made by changing the schedule around some, Gary has made many accommodations for when we need days off, changing shifts or vacation times, he just changes the schedule around -which he is well accustomed to doing- and he could do the same thing to accommodate my religious exemption.

My above example religious accommodations are reasonable & cost nothing. They meet the di minimis requirement for religious accommodations and present no undue hardship to CWS.

So, I feel that I must emphasize this again even though it was already emphasized in the letter to the company from True Hope Ministry on my behalf. According to title VII of the civil rights law, RELIGIOUS BELIEFS MUST BE ACCOMMODATED.

My religious believes are protected by law, and my religion constitutes a protected characteristic in class in this state. No health order or company safety protocol takes precedence over anyone's rights. This states department of Public Health and the CDC recognize this, as there are already exemptions allowed for in their guidelines. Just as CWS is required to accommodate an employee with a medical reason for not wearing a mask, CWS is required to accommodate me because of my religious beliefs.

I look forward to this CWS approval of my reasonable accommodation. This affirmation within one week's time of receipt of this letter is necessary to preclude a filing of complaints with the EEOC and the state's attorney general in the civil rights protection's agency.

I want to take this time now to thank you so much LaKeisha for being open towards my additional solutions that I propose and its very kind of you to write that "I am more than happy to consider them. "Additionally, I wanted to add that even though some of the wording seems harsh it definitely is not a personal attack on you in anyway whatsoever. I am just reciting what the law says about things that could happen if one does not uphold the law. I sincerely hope you understand that.

I look forward to your constitutionally valid reply.

# (EXHIBIT A-4)

On September 15, 2021, LaKeisha Robottom responded with email, she wrote: Dear Philip, Thanks for providing the example in your response – as this is the type of collaboration that I was aiming for in our discussion. After considering your input, we are able to offer you an updated accommodation offer: Your schedule can be temporarily changed to Friday – Monday. This ensures you are able to work alone and without a mask for 24 of the 40 hours (Sat and Sun 12-hour shifts) per week. You will need to work with your manager on Mondays and Fridays to determine if the workload demands and staff available will allow for assessments that will not require you to wear a mask, due to the nature of your job responsibilities.

I understand this uncertainty may not meet your expectations. We are therefore able to offer you the ability to use your vacation or floater holidays on the days you are assigned to work with others. If you don't have vacation or floaters, you can use unpaid leave time. This is a temporary accommodation offer that will need to be revisited when the company changes its engagement rules or every 30 days, whichever occurs first. This is to determine if the accommodation in place meets the needs and objectives of the business and your request. Please reach out to me or your manager with any questions. I look forward to your response and your selection based on the offer above.

# (EXHIBIT A-5)

On September 25th, 2022

LaKeisha Robottom,

I briefly spoke to Gary about the accommodation you provided to me. So, during the last several days I was thinking about it with such unbelief in what you have come up with. So, when one is in the process of coming up with a legal reasonable accommodation for my sincerely held religious beliefs you obviously need to follow Federal and State laws; you have not.

You have intentionally decided to go against Federal and State laws. I have given you the Federal law (several times) that define what a "direct threat" is under Title III of the U.S. Civil rights Act, 36.208 and the State law California Civil Code 46. Even in the company's ethnic training course Marty states, "that we should follow the law at all times!" I also let you know that those who violate federal and state laws are committing a crime in denying the rights of the individual.

First of all, your accommodation offered to me is unfavorable which is discrimination. Secondly, you are also offering me an offensive work environment because you want to seclude me from others by considering me a "direct threat" which has not been proven, which in turn falls under harassment. Thirdly, offering me to take vacation, floaters and unpaid leave of absence twice a week falls under retaliation. All is illegal to do so.

So even though I gave you two examples on how the company could accommodate me, I stated that; "Of course I would lean towards what is legally right and not consider me a "direct threat". I suspect you being one who works in HR Management you are aware of the importance of following the law; so

why you chose not to baffles me.

The most bothering thing about this is how I need to keep reiterating to you the law. Obviously, you don't care about doing the right thing by abiding by the law. So, I also state again, no emergency, pandemic, health orders, executive orders, employment or business policies, rules recommendations, regulations, guidelines, directives, or measures suspend Constitutional rights. No statue of law has been passed by the U.S. Congress that gives an exemption to this facility to allow for my rights to be violated and no president's orders supersede the Constitution.

You have left me with no other choice but to file a formal complaint with the EEOC and the state agency for civil rights being the California Department of Fair Employment and Housing.

Philip A. Koch

Philip Koch

Treatment Plant Oper Grd V

CALIFORNIA WATER SERVICE +1 (661) 8726400

Quality. Service. Value.

calwater.com

Koch, Philip <PKoch@calwater.com> Saturday, September 25, 2021, 3:19 PM Robottom, LaKeisha Witcher, Gary; Cisneros, Juan; Philip A. Koch religious exemption

# (EXHIBIT A-6)

 Gmail

Philip A. Koch <norgevikes@gmail.com>

## religious exemption

Robottom, LaKeisha <lrobottom@calwater.com>                          Tue, Sep 20, 2021 at 8:33 AM
To: "Koch, Philip" <PKoch@calwater.com>
Cc: "Witcher, Gary" <GWitcher@calwater.com>, "Cisneros, Juan" <jcisneros@calwater.com>, "Philip A. Koch"
<norgevikes@gmail.com>

Hi Philip,

I have provided you three options to choose from. You have not reasonably cooperated in this process by refusing to orally discuss a potential reasonable accommodation and demanding those communications be conducted in writing. The company continues to maintain work rules consistent with applicable law, the collective bargaining agreement and providing a safe workplace for all employees.

The three options we have offered are not discriminatory in any way as you mistakenly claim. We agreed to grant your accommodation when you are working alone. You work in a specialized area with limited resources. When we discussed your job tasks, training the OIT is the only job task where you regularly work closely with another person. You rejected this offer. The last two options provided were meant to have you reasonably collaborate with your manager to determine what work could be safely assigned that would not require you to wear a mask. You mentioned not training the OIT in your example. I interpreted that to mean you were okay with not having to train the OIT through this process. Your misunderstanding of my offers could have been avoided had you not refused to have verbal discussions.

Despite your unwillingness to cooperate with us through this process, we have made reasonable and good faith attempts to understand and discuss your accommodation request consistent with your job duties and the work environment. We have considered the information you provided and attempted to offer accommodations in an effort that could work for you but also that complies with our responsibilities to other employees, the business, and our customers. While I would always prefer to speak and collaborate through an issue such as this, I respect your decision to file your complaints with the agencies you've mentioned.

Have a great day.

# (EXHIBIT A-7)

On October 28, 2021, I wrote to LaKeisha Robottom:

Let me address things one by one so we have a clear understanding. I have already stated before that

I would like all done in writing because this is a legal issue, and it is very customary and understood by society that a legal matter should be taken care of in such a matter. The law says I don't have to have a discussion. We already have an interactive process in place in writing. It is very unprofessional to keep writing to me about a verbal discussion especially after I wrote to you that I would like it all in writing. Plus having all in writing has proven that you want to skirt state and federal law and continuously treat me as a "direct threat" to others amongst other illegal actions against me.

So, these work rules and applicable laws (which you don't state what they are). If they conflict with state and federal laws, then they are invalid. Federal and State laws *always* supersede company rules, policies and collective bargaining agreements. CWS resides in the state of California and within the United States of America (not the other way around).

I am sorry that you interpreted that I was okay with either example that I gave. However, I clearly stated that before giving example number 2 that you should lean towards what is "legally right" and do not consider me a "direct threat," but if you choose not to like I already stated accommodations still could be easily made. However, I gave you the benefit of the doubt that since you work in the HR Department that you would be instantly attracted towards doing what is "legally right" and would not have to think twice about it. I would think that one who works in the HR department like yourself would automatically think, "well, if I consider Philip a "direct threat" then that would be "illegal" so I will therefore give him the "legal" accommodation." Unfortunately, I misjudged your character as one who would want to follow Federal and State law. Just because I stated that you "could" doesn't mean you "should." Obviously since I wrote that you "should" lean towards what is "legally right", means to do the opposite would be "illegal." Just as if you had a choice to make between buying a car or stealing a car, you could do either; obviously you would choose to buy the car since that would be the "legal" thing to do.

So, for the record let me make this abundantly clear, "I am only for an accommodation that is "legal", "reasonable" and doesn't violate Federal or State laws."

It is rather disheartening to read that you state I am being uncooperative in these proceedings since I am *very* cooperative with Federal and State laws that you have willingly decided to ignore. If *you* would cooperate with Federal and State laws, my accommodation would have been in place over a month ago.

You have been given Federal and State law several times now and when I give you the law, I also give you the code of law that accompanies it. For there to be a law it must go through the legislative branch of government where it is given a code of law. So, when I recite the law to you I give you the code that verifies that it is actually a law. For example: Federal law that defines a "direct threat" under Title III of the U.S. Civil Right Act, 36.208. California Civil Code 46: It is a violation of personal rights to slander someone by imputing them with an infectious or loathsome disease. So, in your last letter you stated that you are following applicable law, yet you don't write what it is and the code of law that it falls under. So what applicable law is it that you claim to be following (please include its code)?

So, unless you have a court order of quarantine or isolation, there is no medical evidence that I am a "direct threat." You have no proof that if I were not wearing a mask that I would be a threat to the safety of anyone else, that can only be proven by a licensed medical doctor who has given sworn testimony under the penalty of perjury that I in question am carrying a contagious disease. So, it is defamation to continuously assume I am carrying a disease. I am not a direct threat to any colleges, co-workers, supervisors because it has never been determined. There is a strict standard that must be met, and it cannot be made on a stereotype or generalization such as, " all non-mask wearers can infect other people." There is zero evidence that this virus is spread by me. So, to continually state you are concerned about the safety of others after that has already been addressed as invalid and to continually do so can be construed as harassment and intimidation which is against the law.

Federal law 28 CFR 36.202 prohibits "denial of participation" from any business establishment and states that unless I have been individually assessed as a "direct threat" you may not exclude me from the SAME and EQUAL services as others.

Title VII does prohibit CWS from creating a hostile work environment and from retaliation against me or treating me any differently than others. Segregation, separation, demotion or unreasonable work reassignment can be construed as unlawful discrimination, for which you would be legally liable; it is illegal.

DISCRIMINATION BASED ON RELIGION IS PROHIBITED IN CALIFORNIA

The California Fair Employment and Housing Act (FEHA) prohibits religious discrimination.

Article 1. Unlawful Practices, General

California Gov. Code 12940: The fair employment ACT

I won't cite the whole law. But, within that law it states it is "illegal" to *discharge* the person from employment. Suggesting I take time off (*discharge*) without pay is illegal.

So, to suggest that if I agreed to your accommodation of working weekends only and then when Friday and Monday come to avoid me being around others because you consider me a "direct threat" is illegal. Then to suggest I take time off work without pay, or vacation, or floater days is all illegal because you are considering me a "direct threat" and it does not fall under the lines of a "reasonable and legal" accommodation; it is highly "unreasonable and discriminative. When you retaliate and violate against federal and state law it is a direct retaliation against me and my religious exemption/beliefs because you are not giving me a "legal and reasonable" accommodation which in turn makes it discrimination. A right is something that cannot be taken from me, without due process of law. My right to religious expression is guaranteed by both the California Constitution and the

United States Constitution. ***Veiling*** my face is in violation of my religious liberty which is a Constitutionally protected right.

A legal religious accommodation means that my beliefs/exemption are ***honored at all times!*** So therefore, a reasonable, legal accommodation would be for me to come to work without a mask for the reasons already mentioned above regardless of who I am around. Since I have not been proven to be a "direct threat" to anybody in a court of law then my accommodation is expected. Therefore, changing my schedule in any way is not necessary.

"And we all, who with unveiled faces contemplate the Lord's glory, are being transformed into His image with ever increasing glory, which come from the Lord, who is the Spirit." (2 Cor. 3:18)

I also wanted to let you know that I held off on filing my complaints until November 2, 2021 because I came upon this video that was especially made for those who work in the HR department to understand the laws (there are many more laws that I haven't even touched upon in this letter that you will find out that the company and yourself are breaking) and what is required to give a legal reasonable accommodation. So as a last-ditch effort to give you and the company an opportunity to abide by the laws I offer you this. So, if you decide to educate yourself and the company and yet continue not to provide me with the accommodation, I seek then I will proceed forward with what I have to do.

With best intentions,

Philip A. Koch

(Then I included a 90-minute video from Peggy Hall especially made for those who work in the HR Dept.)

# (EXHIBIT A-8)

On April 28, 2022, John Jay Singleton, ADA Advocate responded to CWS & EEOC

John Jay Singleton, ADA Advocate
1444 Main Street, Suite 1814
Ramona, California 92065
john@professionaladvocates.com

Jorge Sosa California Water Service Company
U.S. EEOC -- Office Automation Assistant Lynne McGhee, General Counsel
255 E. Temple Street, 4th Floor 1720 N. 1st Street
Los Angeles, CA 90012 San Jose, CA 95112
jorge.sosa@eeoc.gov
Raymond F. Lynch
425 Market Street, 26th Floor
San Francisco, CA 94105

April 28th 2022.
RE Notice to Amend Charges in the Matter of:
Philip A. Koch v. California Water Service Company
EEOC Charge No. 480-2021-04331
Please be advised that I, John Jay Singleton, am an ADA advocate for Philip A. Koch who has
filed a charge of "religious discrimination" against his employer California Water Service Company.
The charges were erroneously made based upon advice given in bad faith by my client's employer
California Water Service Company (CalWSC). This matter involves disability discrimination and
retaliation in violation of Title I of the Americans with Disabilities Act of 1990 and the Americans with
Disabilities Act Amendments Act of 2008. My client is hereby amending the charges to "discrimination
based upon disability" and "retaliation" each in violation of Title I of the Americans with Disabilities Act.
Mr. Koch has advised me that CalWSC has adopted policies commonly associated with the
term "Covid-19", which is claimed to be a contagious disease. I've been advised and have reviewed
this policy known as the "California Water Service Group Business Code of Conduct"[1]

as it pertains to

offering accommodations you may recognize as the following:
a) disclosure of medical history or information (e.g. "vaccine status"),
b) disclosure and collection of vital statistics (e.g. body temperature),
c) medical examinations,
d) medical interventions such as mask-wearing or vaccines,
e) isolation, segregation or quarantine (e.g. the oxymoron "social distancing")
f) clinical trials during an emergency use authorization period
These accommodations are offered under the so-called "Covid-19" policies used by employers
for the purpose of preventing the spread of such contagious disease. Having a contagious disease is
defined as having a disability under the Americans with Disabilities Act.[2]
CalWSC has adopted a policy titled "California Water Service Group Business Code of
Conduct" and its "Diversity, Equality, and Inclusion Policy" that conflicts with its so-called "Covid-19"
policy, to wit:
Section 13.0 "Equal Employment and Working Conditions" states,
"The Company is committed to providing equal opportunity in all aspects of
employment and does not tolerate any illegal discrimination, harassment or retaliation
1
2 Bragdon v. Abbott, 524 U.S. 624 (1998)

of any kind. All employment practices and decisions, including those involving
recruiting, hiring, transfers, promotions, training, compensation, benefits, discipline and
termination, must be conducted without regard to age, sex, race, color, ancestry,
religion, creed, citizenship status, disability, national origin, marital status, military
status, sexual orientation, gender identity or any other characteristic protected by law or
any other non-job-related factor or activity, and must comply with all applicable laws. In
addition, the Company will provide reasonable accommodation for disability and
religion as required by law."[3]
The Americans with Disabilities Act prohibits employers from imposing any accommodations
(i.e. "Covid" policies) upon employees unless they meet the criteria for establishing that the employee
is a direct threat following an individualized assessment (diagnosis). CalWSC is prohibited by law
from requiring any medical examination in this process as it is an accommodation for which CalWSC
must advise my client that he has the right to accept or refuse.[4]
My client is a qualified individual with a disability or perceived disability and also, regarded as

having a disability. Mr. Koch is also regarded as having a disability that is other than transitory and minor. CalWSC has also adopted a policy that demonstrates that it regards my client as having a disability. The latter is not a necessary fact in the event CalWSC wants to deny it; however, CalWSC's written "Covid" policies demonstrate very clearly that it does in fact regard my client as having a disability (contagious disease) that is other than transitory and minor.

CalWSC has made a record of such disability by mis-classifying my client as having a physical or mental impairment that substantially limits his ability to engage in one or more major life activities. However, Mr. Koch is an individual with a disability or a perceived disability who meets the skill, experience, education, and other job-related requirements of his current employment position, and who, with or without reasonable accommodation, can perform the essential functions of his current job. CalWSC illegal policies are an impairment or disability for my client because he has been prevented from doing his job unless he agrees to comply with the policies, even though they are not job related.

Under the Americans with Disabilities Act, my client is not required to discuss the nature of such disability and is not required to request reasonable modifications of such policy; and, is not required to accept any accommodations unless CalWSC has conducted an individualized assessment and then determined Mr. Koch to be a direct threat. The voluminous and non-sensical pages in his employer's response fail to include any such records. The offered accommodations themselves cannot be used to conduct the individualized assessment as this would violate the ADA and my clients' medical privacy rights.

Based on the foregoing, my client has the right to proceed under the first two prongs of the ADA (not required to obtain any medical diagnosis of a disability). CalWSC has no immunity. CalWSC is therefore required to prove that my client is a direct threat under the criteria of the ADA or that it has some other exception or exemption from complying with the ADA.

Claiming there is a "pandemic" (even if it were ever proven) or that some website "guidelines" or other commentary changed the law is not a legal defense to CalWSC's violation of disability law and my client's rights thereunder.

• Mr. Koch and I are requesting a copy of the records you rely upon that have been used to determine that he is a direct threat and that the accommodations you offer have the appropriate medical necessity and efficacy.

• We are also requesting evidence of financial responsibility establishing that first, CalWSC has an insurable risk or legal duty of care to protect employees from such contagious disease; and second, that CalWSC is insured against any adverse health consequences an employee may suffer
3 https://www.calwatergroup.com/environmental-social-governance/humanrights/ and
https://www.calwatergroup.com/environmental-social-governance/dei/
4 29 CFR Part 1630.9(d) of the ADA, 21 USC §360bbb-3(e)(1)(a) of the Food, Drug & Cosmetic Act

as a result of accepting its accommodations since these are not being administered under the supervision of any licensed physician and do not consider the prior medical history of my client or any contra-indications. You will need to provide a certification from your insurance carrier or an insurance binder establishing this relevant coverage.

• CalWSC is also required to identify or disclose any health orders obtained from a court under which it has been required to impose its so-called "Covid" policies. The relevant "health order"5 should

be a court order following an evidentiary hearing in a court of competent jurisdiction that has determined the respondent employee to a be direct threat based upon a physician's affidavit and competent evidence. General commentary on a website is not a health order.

Please be advised that website commentary, "CDC guidelines", even CalOSHA regulations, executive orders, and administrative orders do not amend or repeal laws and that no laws have changed and that CalWSC has obtained no legal authority, or no new legal duty, to impose any of its

so-called "Covid" policies on my client. Informing my client over and over again about the so-called "Covid" policies does not make them legal or legally binding upon him. None of these so-called policies are legally binding upon my client and in fact, violate long-standing public health policy, state law and as in this case, the Americans with Disabilities Act. None of these documents included with the response given by CalWSC are relevant, and none of these documents identify any new legal duty of care to comply with any single provision therein. Laws do not conflict with each other and the ADA has not been amended or repealed by any of these documents.

• After careful review and discussion with my client and the records appearing in the file, I have been unable to discover that you have given any conspicuous notice regarding the manner in which your offered accommodations are essential to my clients' performance of his or her employment duties. To be certain, you may have given notice regarding the so-called "Covid-19" policy, but I have not discovered any conspicuous notice demonstrating how this policy is related in any way to my clients' ability to perform his or her essential job function. We are requesting to see a copy of such notice and a written description of how your offered accommodations are necessary for my client to do his or her job, and without which, he would be unable to do his job.

Regarding "Exemptions"

CalWSC has deceptively advised my client he can request a "medical exemption" or a "religious exemption" from these accommodations (Covid policy). Please be informed that giving legal advice regarding one's legal rights in this situation may constitute the unauthorized practice of law, even if the one giving the advice is an attorney, but not retained by the one intended to receive the advice.

It is important for you to understand that unless you have an insurable risk or legal duty to impose such accommodations upon employees, especially as a condition of employment, there are no legal "exemptions" and relying upon them would be legally indefensible and unfairly shift the burden of proof from CalWSC to my client. CalWSC alone has the burden to prove it has an exemption or exception from complying with the ADA.

It is also important to note that at no time has CalWSC disclosed the legal criteria for such "exemptions". This is in bad faith and likely violates the employment agreement CalWSC has with my client. Even if CalWSC "exempted" my client from some of the accommodations, it has demonstrated that it fully intends to impose others and even punitive measures for obtaining such "exemption". This is again, at least in bad faith, and likely in breach of the employment agreement, whether or not it is in written form.

Clinical Trials

Mr. Koch is not required to participate in clinical trials, nor is he required to participate in clinical trials as a condition of employment. At this time, the State of California, the United States and each of the other forty-nine states is considered to be within what is known as an "emergency use authorization period" or "EUA". This is also established by the Food and Drug Administration (FDA). 5 California Health & Safety Code, Sections 121365 & 121367

The meaning of which is that any medical intervention (such as the so-called "vaccine" or even mask-wearing) pertaining to the reason for the declared EUA is a clinical trial or epidemiological experiment;

and therefore, cannot be imposed upon anyone against his right to informed consent. Please see the first footnote and 21 CFR Part 50.20 and 29 CFR Part 1630.9(d).

Vaccine

Please be further advised that the clinical definition of "vaccine" is that it is a medical intervention that prevents infection and the spread of infection. If someone is concerned about contracting a contagious disease, he can simply take the vaccine. But as we have all likely heard in the news that those with "vaccines" regarding "Covid-19" must still take precautions. This establishes the fact that there is no vaccine. Therefore, no one can be required to take such a "vaccine" as it is

not a "vaccine". Moreover, the news we all hear about an FDA approved vaccine pertains to a so-called "vaccine" that is not commercially available in the United States, even if it were a vaccine and

even if there were no EUA period.

Finally, the 5th Edition of the Diagnostic and Statistical Manual for Mental Health defines the belief and behavior or regarding oneself as having an illness, such as a contagious disease, or regarding others as having an illness, and then taking measures to try and treat such illness, is itself, a mental illness known as "Factitious Disorder" and "Factitious Disorders Imposed upon Another" (FDIA). You may also recognize this as Munchausen Syndrome by Proxy. Regarding my client as having a contagious disease and seeking to treat him for it without first having any diagnosis, or without a court order, or without seeking his informed consent, is symptomatic of having such mental illness and patently illegal, not to mention a clear violation of your actual legal duty of care.

Unless you have conducted an individualized assessment to determine if any of my clients is a direct threat, or that the disability he or she is regarded as having is both transitory and minor, or that refusing the offered accommodations would create an undue financial burden or fundamentally alter the manner of operations, or there is evidence of any insurable safety risk (for which you have a bona fide insurance binder and for which such basis is not merely speculative and based upon generalization or stereotype) you, as my clients' employer, are required by law to provide each of my clients' equal access as employees. In other words, you will cease and desist from imposing the ridiculous and asinine "Covid" policies upon any of my clients.

CalWSC has violated its legal duty of care under the ADA to aid and encourage those with disabilities as they exercise and enjoy their rights under the ADA. CalWSC has violated its own policies regarding "complying with all laws" and "having zero tolerance for disability discrimination". Keep in mind that CalWSC stands to lose possibly millions of dollars in federal funding for these violations and that it may also suffer substantial fines and penalties, especially based upon the sheer number of employees who have suffered similar violations.

In addition to providing the documents my client and I are requesting, CalWSC may want to consider complying with its own published policies regarding its bold claims that CalWSC does not tolerate discrimination of any kind, including discrimination based upon disability.

It is also worth noting that the EEOC is participating with the respondent CalWSC in its disability discrimination and bad faith advice by the publication of its "Guidance Manual" that advocates and advises CalWSC and other employers about how to defeat a claim of "religious exemption".

My client and I are thereby amending the charges against California Water Service Company to "discrimination based upon disability" and "retaliation" each in violation of Title I of the Americans with Disabilities Act; and we also hereby demand a "right to sue" letter so that Mr. Koch can proceed to the United States District Court.

Sincerely,
John Jay Singleton, ADA Advocate

Copy to: Philip A. Koch

# (EXHIBIT A-9)

California Water Service Company Raymond F. Lynch
Lynne McGhee, General Counsel 425 Market Street, 26th Floor

1720 N. 1st Street San Francisco, CA 94105

San Jose, CA 95112

May 26th, 2022.

RE Mock Meeting of May 26, 2022

Greetings,

I had recently amended my EEOC charges against CalWater and given notice thereby. Near

the same time, my employer initiated a telephone conference with myself, Ms. Robottom, Ms. Davis,

Mr. Webb, Mr. Cisneros and Mr. Witcher (outside of the EEOC proceeding). I had retained an ADA

advocate to assist me at this meeting as it is my right under the ADA. This meeting was not scheduled

or conducted in good faith, but only to give the appearance that my employer attempted to engage in

"meaningful discussion" when in fact, this was not at all the intent of my employer. As you can see by

the many people attending the call, the purpose was to intimidate me into submitting to CalWater's

discriminatory "Covid" policies. These policies conflict with CalWater's own code of ethics and anti-

discrimination provisions as more fully explained in my notice dated April 28th 2022. To date, CalWater

has ignored this notice and has illegally denied my notice that I am a qualified individual with a

disability and that I am regarded as having a disability.

Upon introducing my ADA advocate at today's meeting, Mr. Webb refused to proceed with the

meeting with my ADA advocate present and ended the call within several minutes. This was preceded

by adequate notice that I had an ADA advocate and that he would be present during the call since the

matter concerns disability rights.

I advised Mr. Webb and the recipients of this letter that Mr. Cisneros was not authorized to

represent me and that CalWater had no right to assign me a representative without my consent. The

collective bargaining agreement does not require me to accept Mr. Cisneros or anyone as my

representative as it violates 29 CFR Parts 1630.6(a) and (b).1

Additionally, Mr. Cisneros has a conflict

of interest in that he represents the union and CalWater and he does not represent any of my

interests. He, along with the union and my employer, are my adversaries. Mr. Cisneros is an

advocate of CalWater's discriminatory and illegal "Covid" policies and has no legal training and no

competence in the administration of disability law.

I am proceeding with my amended charges via the EEOC and have requested my right to sue

letter. If this matter is not resolved before that time, be advised that I intend to sue CalWater and its

union for violations of Title I of the Americans with Disabilities Act. I am not required to give you such

notice, and there is no immunity under the ADA, but I wanted to give CalWater a chance to correct its

policies before this discrimination becomes public record.

Sincerely,
Philip Koch

Copies to:
LaKeisha Robottom, lrobottom@calwater.com; Deborah Davis, Ddavis@calwater.com; Ronald Webb,

rwebb@calwater.com; Juan Cisneros, jcisneros@calwater.com; and Gary Witcher,

GWitcher@calwater.com

# (EXHIBIT A-10)

Philip A. Koch
10707 Fieldstone Dr.
Bakersfield, CA 93306
norgevikes@gmail.com

Jorge Sosa, Office Automation Assistant
Los Angeles District Office
Roybal Federal Building
255 East Temple St., 4th Floor
Los Angeles, CA 90012
jorge.sosa@eeoc.gov

CRTIU Supervisor
Los Angeles District Office
Roybal Federal Building
255 East Temple St., 4th Floor
Los Angeles, CA 90012

Raymond F. Lynch
California Water Service Company
425 Market Street, 26th Floor
San Francisco, CA 94105

Cherry-Marie B. Destura ADR Coordinator
Los Angeles District Office
Roybal Federal Building
255 East Temple St., 4th Floor
Los Angeles, CA 90012
cherry.destura@eeoc.gov

May 30, 2022

For Los Angeles District Office EEOC
Charge of Discrimination and Retaliation
Request for Mediation/ Right to Sue Letter

Re: California Water Service
1720 N. First St.
San Jose, Ca. 95112

STATEMENT IN SUPPORT OF COMPLAINT

I am making this amended complaint against my employer for its discrimination and

retaliation against me based upon disability. My original inquiry case # is 480-2021-04331.

Please see below for new amended charge. The EEOC has the authority and legal duty investigate this complaint.

My employer regards me as having a disability. My employer regards me as having a contagious disease and as having an impairment of my immune system and an impairment

of my respiratory system. I am therefore a qualified individual with a disability.

I have been harassed, coerced and intimidated by my employer while it attempts to impose its discriminatory policies upon me.

My employer's policies demonstrate that it regards me as having a disability; and it has taken adverse employment actions against me because of regarding me as having a disability. I have been injured by being denied equal access to the programs and benefits of

- 1 -

employment that are available to other employees and I have suffered loss of income, wages and other benefits from employment.

My employer has also made a record of such disability; by mis-classifying me as having a physical or mental impairment that substantially limits my ability to engage in one

or more major life activities.

My employer has failed to conduct any individualized assessment to determine if I am a direct threat to anyone.

My employer has failed to engage in any interactive process with me concerning disability rights or resolutions.

I duly informed my employer that I am a qualified individual with a disability that substantially limits my ability to engage in one or more major life activities with a "Notice of

Discrimination and Harassment Based Upon Disability"; a copy is enclosed. My employer

ignored my right to claim exemption based upon federal law and personal property rights.

I asked to speak confidentially with my employer's designated employee or representative that is responsible for resolving matters involving the Americans with Disabilities Act and grievances thereunder, but this employee has not been provided to me

and I have not been aided in claiming my rights under the ADA.

My employer has offered various accommodation measures including but not limited to mask-wearing, staying six feet away from others, frequent hand-washing, collection, use
and storage of my vital statistics, histological samples and biometric data and biometric identifiers without adequate or proper notice, adequate disclosures, adequate data retention
security or my informed consent, working in isolation, video-graphic and audio-graphic communications in lieu of face to face communications, working behind clear shielding, and
injections of certain types of suspensions which are being called "vaccinations" yet do not
prevent infection or transmission of any contagious disease and in fact create more disabilities by altering the normal function of my immune system and other cellular functions. My employer has not merely "offered" such accommodation measures, but has
penalized me for refusing such accommodations in violation of 29 CFR Part 1630.9(d).
My employer never conspicuously disclosed that complying with a COVID-19 vaccine requirement, testing requirement, or masking requirement is an essential function of my job.
My employer imposed discriminatory policies upon me that created a disability in that I could
not (was not permitted to) do my job without complying with the policies, yet the policies
were not related to my essential job function.
My employer has adopted policies that perceive un-diagnosed disabilities in me and then create actual disabilities for me because of forcing its accommodations upon me. My
employer encourages others to retaliate against me for exercising my rights under the Americans with Disabilities Act.
I have requested information regarding the risks and benefits of my employers accommodation measures and in response, my employer has retaliated against me by

- 2 -

reprimanding me and then terminating my employment for opposing a discriminatory policy
in good faith and for refusing the accommodation measures instead of providing me with the
information I requested so that I could make an informed decision.

I have exercised my right to refuse such accommodation measures and proposed instead that I be permitted to perform my employment duties without harassment, retaliation, coercion or intimidation as a result of my exercise of such rights, and my employer has prevented and interfered with this occurring.

My employer has instead retaliated against me for exercising my rights under the Americans with Disabilities Act by threatening me with disciplinary measures and penalties

for refusing such accommodation measures, including but not limited to suspension or reduction of pay, limiting my access to the premises where I work, segregation, isolation,

termination of employment, exclusion from programs or services that would permit me to

improve my employment skills or become eligible for advancement, and denied me the possibility for promotion even when I was eligible or would become eligible.

I am thereby being denied equal access to the same programs, activities, benefits, jobs or other opportunities for which I am otherwise qualified, while other employees are

not. I am being segregated, excluded and relegated to lesser services by my employer based solely upon disability.

I have not requested reasonable modifications but only that I be permitted to perform my employment duties without harassment, retaliation, coercion or intimidation.

Each day my employer permitted and encouraged other employees, including my supervisor and managers to harass and intimidate me and ask me for medical, health and

other personal information that does not pertain to, or is not necessary for, the performance

of my employment duties.

My employer has failed or refused to fulfill its duty to aid and encourage me in the exercise of my rights which are protected under the Americans with Disabilities Act.

My employer has demonstrated by the actions of its employees and by its own written policies that it intends to continue such violations of my rights and failures to comply

with the law. My employer has no legal duty of care as demonstrated by its lack of any insurable risk.

REQUEST FOR MEDIATION/ RIGHT TO SUE LETTER

By filing this Charge, I am formally requesting a mediation hearing to resolve these issues. If my employer refuses mediation and the EEOC does not plan to investigate my

Charge, I request an immediate Right to Sue letter without any delay.

- 3 -

## FILE CHARGE MANUALLY

I request that my Charge be entered manually. I request the CRTIU Supervisor to enter my Charge into the EEOC system manually as I do not find the online portal acceptable or accessible for entering my Charge. I am not required to have personal access to printers, scanners, laptops, digital signatures and digital encryption technology in
order to file a Charge of Discrimination and Retaliation. I do not waive access to the US postal system. EEOC internal policies that limit EEOC employee access to their job sites based upon regarding employees as disabled are discriminatory and may be cause to strip
the EEOC of federal funding. I request a written response from the CRTIU Supervisor confirming that my Charge has been filed within 14 business days of receipt of this Notice.

_____

Philip A. Koch

# (EXHIBIT A-11)

**Robottom,**
**LaKeisha <lrobottom@calwater.com>**

Jun 2, 2022,
10:24 AM

to Philip, me, Ronald, Gary

Dear Phillip,

We are aware that you have continued to not comply with the Company's work rule of taking and logging your temperature along with the accompanying information request/attestation at the start of your shifts. As previously communicated you will not be permitted to work without complying with requirement each day you are scheduled to work. Therefore you are being

place on a leave of absence.  We will use your accrued vacation time bank for the processing of your regular paychecks.  Upon exhaustion of this bank, your leave will be transferred to an "unpaid leave" status.

If you change your mind and agree to comply with our well established and safety protocols, you will be allowed to return to work.  We also continue to remain available to meet with you as previously described to engage in the interactive process. Feel free to reach out with any questions.

Thanks!


**LaKeisha Robottom**
Director, Employee Relations & Development
CALIFORNIA WATER SERVICE
+1 (310) 2571455 x71455



Quality. Service. Value.
calwater.com

This e-mail and any of its attachments may contain California Water Service Group proprietary information and is confidential. This e-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this e-mail, please notify the sender immediately by replying to this e-mail and then deleting it from your system.

(EXHIBIT A-12)



**CALIFORNIA WATER SERVICE**

1720 North First Street
San Jose, CA 95112-4598 *Tel:* (408) 367-8200

June 13, 2022

Philip Koch
10707 Fieldstone Drive
Bakersfield, CA 93306

Dear Philip:

As a result of your continuing refusal commencing in late April 2022 to comply with Cal Water's temperature check and COVID screening protocols, (which have been in place for approximately two years, and applicable to all employees), your refusal to cooperate with the Company's efforts to discuss these issues with you and your union representative, and finally, your refusal to engage in an interactive process in connection with any disability you claim or any reasonable accommodation required, you were placed on an unpaid leave of absence as of June 2nd. You were advised at that time that you would remain on leave until you agreed to meet with us and your union representative to discuss your noncompliance, and to participate in an interactive process to understand your claimed work restrictions due to any claimed disability. This meeting had been repeatedly requested by the Company, with you demanding participation by a third party, John Singleton, described only as an "ADA advocate", instead of your union representation under the collective bargaining agreement.

On June 8th LaKeisha Robbottom (Director of Employee Relations and Development) responded to your June 8th email, again in an effort to schedule a meeting to engage with you in the interactive process, with the respect to your unspecified disability and requesting you provide some explanation as to the reason for Mr. Singleton's involvement. You provided no response instead coming to work the next day in violation of the directive you had been given.

Specifically, on June 9, 2022, you showed up at work without authorization, and again without complying with the COVID screening protocols. Your manager, Gary Witcher got Ms. Robbottom on the phone, and you had Mr. Singleton on your phone. You were directed to leave the Cal Water facility by Mr. Witcher. You refused to leave the facility and Mr. Singleton instructed Mr. Witcher and Ms. Robbottom to call the police if they wished to do so. Which they did. You were advised that your failure to leave the facility as directed was a violation of an order, would be considered insubordination, and subject you to disciplinary action, up to and including termination.

Soon thereafter, another meeting/call took place. Mr. Singleton was on the phone with you, along with Mr. Witcher and Ms. Robbottom. Juan Cisneros (UWUA Local 205 President) was also included. At the beginning of the meeting Mr. Cisneros asked you if you wanted him to represent you in this matter. You replied that he could remain on the



**CALIFORNIA WATER SERVICE**

1720 North First Street
San Jose, CA 95112-4598 *Tel:* (408) 367-8200

phone. At that point, your advocate Mr. Singleton said that Mr. Cisneros was not qualified to be your representative and you said that you were going to rely his advice. Mr. Cisneros then said that he was dropping off of the call, which he did immediately. You were again reminded that you were on an unpaid leave of absence and directed to leave the Company facility immediately. You refused. Further, you were reminded again that your insubordination would result in further disciplinary action, up to and including termination. Mr. Singleton directed you to return to work. At that point, you left the conversation, and was later found working – despite not being authorized to do so and having been told to leave.

Tammy Johnson (Bakersfield District Manager) later arrived at the treatment plant. Upon her arrival, she observed you to be working without authorization. She and Mr. Witcher approached you and she once again directed you to cease working, and to immediately leave the facility.

At approximately 11:55 AM, you quit working and returned to your personal vehicle in the parking lot. While in your vehicle, Ms. Johnson asked for your key to the Company building and Company ID badge. You refused to provide them to her unless she provided you with a letter of termination. She told you that you had not been terminated and reminded you that those items were Company property and that she had every right to ask for them. Once again, you were directed to provide Ms. Johnson with the key and badge and advised that your failure to do so would be considered insubordination and subject you to disciplinary action, up to and including termination. You responded by rolling up your car window and ignoring her directive. You subsequently left the facility in your personal vehicle between at approximately 1:15, before the police arrived.

At approximately 6:30 that evening Ms. Robottom received an e-mail communication from your advocate, Mr. Singleton, on which you and I were both copied. In this e-mail Mr. Singleton stated, Mr. Koch does not request nor require any modifications as your "Covid" policy is not related to his essential job function." He went on to state Mr. Koch suffers from no physical or mental impairment that prevents him from performing his essential job functions."

Philip, as you were told, your June 9, 2022 refusal to comply with repeated directives given to you by Cal Water management constituted continuous insubordination and misconduct. Your behavior was totally unacceptable, not consistent with how we expect employees to conduct themselves, and a clear violation of Cal Water's Business Code of Conduct.



## CALIFORNIA WATER SERVICE

1720 North First Street
San Jose, CA 95112-4598 *Tel:* (408) 367-8200

Based on the above, which I communicated to you today during our zoom meeting, your employment with Cal Water is terminated effective today. Your final check will be put in the overnight mail today for delivery tomorrow, and will include pay for tomorrow.

Sincerely,

Ron Webb
Vice President, Chief Human Resource Officer

Cc;    J. Cisneros