1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   PHILIP A. KOCH,                        Case No. 1:22-cv-01333-KES-CDB

12              Plaintiff,                   FINDINGS AND RECOMMENDATIONS TO
                                             GRANT DEFENDANT'S MOTION TO
13        v.                                 DISMISS WITH PREJUDICE

14   CALIFORNIA WATER SERVICE                (Doc. 9)
     COMPANY,
15                                           **14-DAY DEADLINE**
               Defendant.
16

17

18        On October 19, 2022, Plaintiff Philip A. Koch ("Plaintiff"), proceeding *pro se*, initiated

19   this action with the filing of a complaint against California Water Service Company

20   ("Defendant"). (Doc. 1). Defendant filed a motion to dismiss on January 10, 2023. (Doc. 9). On

21   January 24, 2023, the Court granted Plaintiff's *nunc pro tunc* motion for extension of time to

22   respond to Defendant's motion to dismiss. (Docs. 14, 15). Despite this extension, Plaintiff

23   untimely filed his opposition to the motion to dismiss on February 23, 2023. (Doc. 16). Defendant

24   filed its reply on March 3, 2023. (Doc. 17).  The assigned district judge referred Defendant's

25   motion to dismiss to the undersigned on August 7, 2024, for the preparation of findings and

26   recommendations. (Doc. 32). For the reasons explained herein, the undersigned recommends that

27   this case be dismissed with prejudice.

28   ///

1    **I.     APPLICABLE LAW**

2          To survive a motion to dismiss, a complaint must contain "a short and plain statement of

3    the claim showing that the pleader is entitled to relief" such that the defendant is given "fair

4    notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*,

5    550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47

6    (1957)). A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual

7    enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

8    Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the

9    absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police*

10   *Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint, however, should not be dismissed "unless

11   it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that

12   would entitle it to relief." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.

13   2000).

14         In weighing a motion to dismiss, the court must accept material allegations in the

15   complaint as true and construe them in the light most favorable to the plaintiff. *North Star Int'l v.*

16   *Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983). "Indeed, factual challenges to a

17   plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule

18   12(b)(6)." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

19         Leave to amend should be freely granted "unless the court determines that the allegation

20   of other facts consistent with the challenged pleading could not possibly cure the deficiency."

21   *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *Lopez v.*

22   *Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000); Fed. R. Civ. P. 15(a).

23         Finally, courts must construe *pro se* pleadings liberally and hold such pleadings to a less

24   stringent standard than those drafted by attorneys. *Boag v. MacDougall*, 454 U.S. 364, 365 (1982)

25   (per curiam); *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a

26   *pro se* litigant's complaint] 'however inartfully pleaded' are held 'to less stringent standards than

27   formal pleadings drafted by lawyers . . .'" (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972))).

28   A court should dismiss a *pro se* complaint if "it is absolutely clear that the deficiencies of the

1    complaint could not be cured by amendment." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir.

2    2012).

3    **II.      FACTUAL BACKGROUND**

4            Plaintiff alleges he was discriminated and retaliated against by his former employer

5    (Defendant) in violation of the Americans with Disabilities Act ("ADA"). *See* (Doc. 1).  Plaintiff

6    states he was employed by Defendant since October 1999. On August 9, 2021, he wrote to

7    Defendant's human resources director LaKeisha Robottom to request a religious exemption from

8    Defendant's COVID-19 policy, providing that his "sincerely held religious beliefs did not allow

9    him to cover his face," as well as "impeded [him] from subjecting his body to medical

10   experimentation and 'Covid-19' tests and vaccines." He also "affirmed his privacy rights" and

11   "stated there was no evidence he was carrying an infectious disease." *Id.* at 6, ¶¶ 28-29.

12           Plaintiff's employer "hounded him to schedule meetings to verbally discuss possible

13   accommodations" during review of Plaintiff's religious exemption request. Plaintiff refused these

14   meetings since he was "advised to document the negotiations in writing and was weary [sic] that

15   these potential meetings were opportunities for [Defendant] to coerce him into complying with

16   his employer's 'Covid-10 Policy.'" On August 22, 2021, Robottom emailed Plaintiff that, "as he

17   had not yet provided the company with proof of him being vaccinated, they were required to treat

18   him as though he was not vaccinated." Plaintiff states that his employer made a record of his

19   vaccination status "and of his disability" without "an individualized assessment from a licensed

20   medical professional." Robottom informed Plaintiff that his employer could accommodate his

21   request for exemption from wearing a mask "only when he was working alone or not in close

22   proximity of other employees." *Id.* at 6-7, ¶¶ 30-31.

23           Robottom informed Plaintiff that the mask requirement "had been put in place to

24   safeguard employees" from the spread of COVID-19 and was in compliance with "Cal/OSHA

25   and CDC guidelines." She stated the company "would experience an undue hardship by allowing

26   [P]laintiff not to wear a mask, as it would 'compromise workplace safety' and could potentially

27   require a deviation from the Collective Bargaining Agreement between California Water Service

28   and Local 205 of the Utility Workers Union of America." *Id.* at 7, ¶¶ 32-33.

On August 31, 2024, Plaintiff emailed Robottom to suggest "solutions to accommodate his religious beliefs." He provided that there was no proof that he was a threat to others and thus his "refusal to wear a mask . . . was not grounds for exclusion from the workplace." Plaintiff stated that, "[t]herefore, accommodations were rather easy," namely Plaintiff could "show up to work without a mask and perform his job as he normally did." Plaintiff also suggested that his supervisor could "change the schedule to accommodate [Plaintiff's] religious exemption," which was commonly done when employees took vacation days or changed shifts. *Id.*, ¶ 35.

On September 15, 2021, Robottom offered a "temporary accommodation" via email, suggesting Plaintiff's schedule be "temporarily changed to Friday through Monday" to ensure Plaintiff "would be able to work alone and without a mask for 24 of the 40 hours per week." She stated that Plaintiff would need to consult with his manager to "determine if the workload demands and staff available allowed for assessments that would not require him to wear a mask." She suggested Plaintiff use his "vacation or floater holidays on the days he was assigned to work with others" or otherwise use unpaid leave time. *Id.*, ¶ 36.

On September 25, 2021 Plaintiff emailed that "the offered accommodation was unfavorable and constituted discrimination," because he was considered a "direct threat" without "any individualized assessment," creating "an offensive and hostile work environment." He also stated that offering him to use his "vacation, floaters and unpaid leave of absence twice a week fell under retaliation and was illegal." Plaintiff communicated that he had "no choice" but to file a formal complaint with the "EEOC and the state agency for civil rights." On September 28, 2021, Robottom replied that it was "unfortunate that [Plaintiff] had not 'reasonably cooperated' in the process of defining possible accommodations." *Id.* at 8, ¶¶ 37-39.

On October 28, 2021, Plaintiff "wrote back to" Robottom, stating "that there was no court order of quarantine or isolation nor medical evidence that he was a 'direct threat.'" He provided that Defendant had "no proof" that, without a mask, Plaintiff was a "threat to the safety of anyone else. Therefore, it was defamation to continuously assume [P]laintiff was carrying a contagious disease." He communicated that, since there was "zero evidence" that COVID-19 was spread by Plaintiff, Defendant's stating it was "concerned about the safety of others could be construed as

unlawful harassment and intimidation." *Id.*, ¶¶ 40-41.

He further provided that his employer was "prohibited from creating a hostile work environment and retaliating against him or treating him any differently than others. Segregation, separation, demotion or unreasonable work reassignment could be construed as unlawful discrimination." He stated that the provided accommodations were illegal, "as was suggesting that Plaintiff take time off work without pay, or vacation, or floater days," that the solutions proposed were "unreasonable and discriminatory," and "a legal religious accommodation entailed his beliefs were honored at all times" and "therefore, a reasonable, legal accommodation would be for [P]laintiff to come to work without a mask regardless of who he was around." *Id.* at 8-9, ¶¶ 42-44.

On April 28, 2022, Plaintiff's "ADA advocate" emailed the EEOC and Defendant stating that Plaintiff's "petition for a religious exemption was erroneously made based upon advice given in bad faith by his employer, and actually, the matter involved disability discrimination and retaliation in violation of Title I of the ADA." Plaintiff then "amended his [EEOC] complaint." His ADA advocate asserted that Defendant's policy regarded Plaintiff as "having or potentially having a contagious disease, which was a disability as defined by the ADA," that the ADA "prohibited employers from imposing any accommodations" upon employees unless they were a "direct threat following an individualized assessment (diagnosis)," and that Plaintiff's "employer was prohibited by law from requiring any medical examination." *Id.* at 9, ¶¶ 45-46.

The advocate further informed Defendant that Plaintiff was a "qualified individual with a disability," that Defendant had made a record of such a disability "by mis-classifying him as having a physical or mental impairment that substantially limited his ability to engage in one or more major life activities," that Defendant's "illegal policies" were "not job related" and were thus "an impairment or disability" for Plaintiff because he was "prevented from doing his job unless" he complied with them, that "under the ADA, [P]laintiff was not required to discuss the nature of such disability nor to request reasonable accommodations of such policy," and that Plaintiff was not required to "accept any accommodations unless his employer conducted an individualized assessment and then determined [Plaintiff] was a direct threat." *Id.*, ¶ 47.

The advocate requested records regarding determination of Plaintiff as a "direct threat" and "that the accommodations [Defendant] offered had the appropriate medical necessity and efficacy." The advocate further requested "evidence of financial responsibility establishing" that Defendant had an "insurable risk or legal duty of care to protect its employees from such contagious disease" and that Defendant was "insured against any adverse health consequences an employee might suffer as a result of accepting its accommodations." *Id.* at 10, ¶ 48.

On May 23, 2022, Plaintiff's supervisor called him regarding a meeting to take place on May 25, 2022, concerning Plaintiff "not reporting his temperature to the company." Roughly thirty minutes afterwards, the supervisor called him again "stating that the meeting would be in half an hour." Plaintiff alleges that he "knew this was a strategy to prevent his ADA advocate" from being present. On May 26, 2022, Plaintiff emailed Defendant's general counsel, informing her he was being "threatened and intimidated" due to the meeting not being scheduled or "conducted in good faith," and only to appear as if Defendant "engaged in 'meaningful discussion'" when the actual purpose was to "intimidate [Plaintiff] into submitting" to Defendant's COVID-19 policy. He stated that the policy "conflicted with [Defendant's] own code of ethics and anti-discrimination provisions" and that Defendant was "ignoring his notice of discrimination on the basis of disability." *Id.*, ¶¶ 49-51.

On May 30, 2022, Plaintiff "filed an amended complaint" with the EEOC against Defendant for "discrimination and retaliation" due to disability. On June 2, 2022, Robottom emailed Plaintiff informing him he would "not be allowed to work" since he would not "[log] his temperature along with other medical information at the start of his shift." She stated that Plaintiff was on "leave of absence" and his vacation time would be used for processing of his paychecks, upon exhaustion of which, he would be put on unpaid leave. She stated that if Plaintiff "changed his mind, [Defendant] was still willing to let him return to work." *Id.* at 10-11, ¶¶ 52-53.

One June 9, 2022, Plaintiff "showed up to his workplace." He was ordered to leave by his supervisor and Robottom and that refusal would subject him to disciplinary action. They called the police and Plaintiff left before police arrived. On June 13, 2022, Plaintiff received a termination letter stating that "his refusal to comply with repeated directives from management

1   regarding his employer's 'Covid-19 Policy' constituted continuous insubordination and

2   misconduct and were the cause of his termination." *Id.* at 11, ¶¶ 54-55.

3   **III.   DISCUSSION**

4       Plaintiff asserts two federal claims against Defendant, the first for discrimination in

5   violation of the ADA (Doc. 1 at 11-22) and the second for retaliation in violation of the ADA (*id.*

6   at 22-26). Defendant advances four arguments in support of its motion to dismiss Plaintiff's

7   complaint. *See* (Doc. 9-1). First, Defendant argues that Plaintiff has failed to state a claim of

8   discrimination based on disability, in that Plaintiff failed to plausibly allege he is disabled, failed

9   to plausibly allege that he is a qualified individual, and that Defendant terminated him for

10  legitimate business reasons. Second, Defendant argues that Plaintiff has failed to state a claim of

11  retaliation because Defendant implemented its COVID-19 policy before any alleged protected

12  activity and because Plaintiff was terminated for his refusal to comply with directives. Third,

13  Defendant argues any remaining claims brought by Plaintiff are legally baseless. And fourth,

14  Defendant argues Plaintiff failed to exhaust his administrative remedies. *Id.* at 2.

15      **A.  Defendant's Request for Judicial Notice**

16      Defendant includes a request for judicial notice in its motion, seeking notice of (1)

17  attached documents related to Plaintiff's EEOC charges , and (2) the fact that COVID-19 is a

18  dangerous illness. *See* (Doc. 9-2). Plaintiff's opposition does not mention the former but opposes

19  the latter, arguing that the Court cannot take judicial notice of COVID-19 because it is "not

20  competent to do so," as Defendant failed to attach enough evidence and failed to provide facts

21  granting it a "new legal duty or legal authority" to "impose mitigation measures" that exceed the

22  "mandate granted to the Department of Health." Plaintiff also argues that Defendant did not

23  include enough information to take notice of reports from the CDC, and that the CDC is not a

24  "legal authority" because the "CDC website commentary" does not constitute an "individualized

25  assessment" nor legal precedent, and is "expressly disclaimed" for its lack of accuracy. (Doc. 16

26  at 13).

27      "Generally, district courts may not consider material outside the pleadings when assessing

28  the sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc.*, 899

7

F.3d 988, 998 (9th Cir. 2018). Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." If a fact is not subject to reasonable dispute, the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

When ruling on a motion to dismiss, a court may consider facts subject to judicial notice without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). "[A court] may take judicial notice of records and reports of administrative bodies." *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (internal quotation marks omitted). This includes EEOC charges and right-to-sue letters. *See Hellmann-Blumberg v. Univ. of Pac.*, No. 12-286, 2013 WL 1326469, at *1 (E.D. Cal. Mar. 29, 2013). In light of the above, and the lack of opposition from Plaintiff, the Court grants Defendant's request to take notice of the EEOC documents attached to the motion, including charges, a notice of withdrawal, and a right-to-sue letter. (Doc. 9-3).

As to the request regarding COVID-19, Plaintiff's arguments in opposition are unpersuasive. Since the onset of the COVID-19 pandemic in March 2020, courts across the country have "routinely taken judicial notice of the likely risks and severity of COVID-19 and the potential efficacy of mitigation measures" as reported by public health authorities. *Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2020 WL 3453452, at *7 (S.D.N.Y. June 24, 2020) (collecting cases); *see Metroflex Oceanside LLC v. Newsom*, 532 F. Supp. 3d 976, 980 (S.D. Cal. 2021) (taking judicial notice of "information about the COVID-19 virus," and "government orders related to the COVID-19 pandemic"); *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) (taking judicial notice of the CDC's statements that risk of severe COVID-19 illness increased sharply with elevated body mass index); *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of information concerning the transmission of Lyme disease from the CDC).

The Court takes judicial notice of the following statement on the CDC's website:

"COVID-19 (coronavirus disease 2019) is a disease caused by the SARS-CoV-2 virus. It can be very contagious and can spread quickly. As of June 1, 2024, nearly 1.2 million people have died of COVID-19 in the U.S . . . COVID-19 spreads when an infected person breathes out droplets and very small particles that contain the virus. Other people can breathe in these droplets and particles, or these droplets and particles can land on others' eyes, nose, or mouth . . . Anyone infected with COVID-19 can spread it, even if they do NOT have symptoms."[1] *See Milton v. California Dep't of Corr. & Rehab. CTF-Soledad*, No. 23-CV-00582-JST, 2024 WL 1772847, at 4 (N.D. Cal. Apr. 23, 2024) (taking notice of COVID facts from the same CDC source).

Because government publications are "matters of public record" and can be easily verified, they are proper subjects of judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *see Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 978 n.2 (9th Cir. 2007) (explaining that a court may take judicial notice of a government publication); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (taking judicial notice of public records that "can be accessed at Santa Monica's official website").

Defendant also attaches to its motion to dismiss documents related to its COVID-19 policy. Exhibit 5 is titled "CALIFORNIA WATER SERVICE GROUP PROCEDURE," with a header listing "Subject: COVID-19 Essential Services Guidelines." An issue date shows April 23, 2020. (Doc. 9-4 at 5-10). Exhibit 6 appears to be Defendant's "written COVID-19 Prevention Program (CPP) pursuant to an Emergency Temporary Standard in place for COVID-19" (*id.* at 12-24), dated February 11, 2021 (*id.* at 24.), and Defendant's "Appendix A: Cal Water COVID-19 Contact Tracing Form" (*id.* 25-28). Exhibit 7 appears to be Defendant's "COVID-19 Prevention Program (CPP)," superseding "Phase Two & Phase Three Covid-19 Compliance Plan." *Id.* 30-49. A revision date shows October 11, 2021, and an effective date of January 1, 2021. *Id.* at 30.

While a court generally cannot consider material outside the complaint when ruling on a Rule 12(b)(6) motion to dismiss, a court may consider exhibits submitted with the complaint.

---

[1] https://www.cdc.gov/covid/about/?CDC_AAref_Val=https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19.html (last accessed November 1, 2024).

1     *Hamilton v. Bank of Blue Valley*, 746 F. Supp.2d 1160, 1167 (E.D. Cal. 2010) (citing *Van Winkle*

2     *v. Allstate Ins. Co.*, 290 F. Supp.2d 1158, 1162, n.2 (C.D. Cal. 2003)). In addition, a "court may

3     consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the

4     document; (2) the document is central to the plaintiff's claim; and (3) no party questions the

5     authenticity of the copy attached to the 12(b)(6) motion." *Id.* at 1168 (quoting *Marder v. Lopez*,

6     450 F.3d 445, 448 (9th Cir. 2006)). Accord, *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)

7     ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party

8     questions, but which are not physically attached to the pleading, may be considered in ruling on a

9     Rule 12(b)(6) motion to dismiss."), overruled on other grounds by *Galbraith v. County of Santa*

10     *Clara*, 307 F. 3d 1119 (9th Cir. 2002). "A court may treat such a document as 'part of the

11     complaint, and thus may assume that its contents are true for purposes of a motion to dismiss

12     under Rule 12(b)(6)." *Hamilton*, 746 F. Supp.2d at 1168 (quoting *United States v. Ritchie*, 342

13     F.3d 903, 908 (9th Cir. 2003)).

14        Here, Plaintiff refers to Defendant's COVID-19 policy in his complaint, it is central to his

15     claim, and although Plaintiff had an opportunity to challenge the authenticity of the policy in

16     opposing Defendant's motion to dismiss, he did not do so in his opposition. *See* (Doc. 16).

17     Accordingly, the Court proceeds as if the policy documents attached as exhibits 5 through 7 are

18     part of the complaint and assumes that their contents are true for purposes of ruling on

19     Defendant's motion to dismiss. *Branch*, 14 F.3d at 454; *Hamilton*, 746 F. Supp.2d at 1168.

20        **B.  The Complaint Fails to State a Claim of Discrimination under the ADA**

21        Defendant argues that Plaintiff fails to state a claim of discrimination based on disability.

22     Defendant provides that Plaintiff has not and "cannot plausibly allege that he suffered from a

23     disability." *Id.* at 16.

24        To establish a disability discrimination claim under Title I of the ADA, a plaintiff must

25     prove "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for the employment in

26     question, and (3) that [his] employer discharged [him] (or took other adverse employment action)

27     because of [his] disability." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir.

28     2015) (quotation omitted); *Hutton v. Elf Atochem North Am., Inc.*, 273 F.3d 884, 891 (9th Cir.

2001) (same). A plaintiff must plausibly allege that he has "a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment." 29 C.F.R. § 1630.2(k)(2). An adverse action includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

### a. *Plaintiff's Allegations Concerning Disability*

Defendant cites to the cases of *Speaks v. Health Sys. Mgmt., Inc.*[2] for the proposition that refusing to get a vaccine required by an employer is not an impairment and reflects a personal choice. (Doc. 9-1 at 15-16). Defendant also cites to *Shklyar v. Carboline Co.*[3] for the proposition that requiring Plaintiff to follow its COVID-19 policy did not result in a determination that Defendant regarded him as having a disability, as to do so would infer that Defendant regarded all of its employees as having a disability, and such an inference is implausible. *Id.* at 15-16.

In his complaint, Plaintiff alleges no other basis for disability other than Defendant misclassifying him and regarding him as disabled, due to Defendant's COVID-19 policy treating him as if he was carrying an infectious disease. (Doc. 1 at 9, ¶¶ 45-47). He reiterates this in his opposition brief, stating he "never claimed that being 'unvaccinated' is a disability. The 'vaccine requirement' simply demonstrates that [D]efendant regarded [P]laintiff as disabled. The unvaccinated status was not claimed as the disability itself." (Doc. 16 at 6).

Plaintiff provides no basis to conclude that Defendant classified him as having "an impairment that substantially limited one or more major life activities when compared to most people in the general population." 29 C.F.R. § 1630.2(k)(2). Plaintiff does not allege that Defendant ever classified him as having a COVID-19 infection that was severe enough to substantially limit one of his major life activities. "Defendant instead classified him as refusing to

---

[2] No. 5:22-CV-00077-KDB-DCK, 2022 WL 3448649 (W.D.N.C. Aug. 17, 2022).

[3] 616 F. Supp. 3d 920, 926 (E.D. Mo. 2022), aff'd, No. 22-2618, 2023 WL 1487782 (8th Cir. Feb. 3, 2023), cert. denied, 144 S. Ct. 288, 217 L. Ed. 2d 131 (2023).

1   follow the COVID-19 policy that applied to all employees. Refusing to get a vaccine required by

2   an employer is not itself an 'impairment' of any sort." *Cunningham v. Univ. of Hawaii*, No. 22-

3   CV-00504 HG-WRP, 2023 WL 1991783, at *3 (D. Haw. Feb. 14, 2023), reconsideration denied,

4   No. 22-CV-00504 HG-WRP, 2023 WL 2989629 (D. Haw. Mar. 10, 2023), and aff'd, No. 23-

5   15345, 2023 WL 10351531 (9th Cir. Sept. 14, 2023) (citations and quotations omitted).  Accord

6   *Kekering v. Nike, Inc.*, No. 3:22-cv-01790-YY, 2023 WL 5018003, at *2 & n.2 (D. Or. May 30,

7   2023) (cataloging cases for the proposition that "[c]ourts have invariably rejected the theory that

8   an individual's decision to forgo a vaccination constitutes a disability under the ADA."), *R&R*

9   *adopted by* 2023 WL 4864423 (July 31, 2023).

10         Plaintiff pleads that Defendant's COVID-19 policy was imposed "upon <u>all of its workers</u>."

11   (Doc. 3 at 3 ¶ 9) (emphasis in original). Further, Plaintiff attaches to his complaint

12   correspondence addressed to him from Defendant's Chief Human Resource Officer, Ron Webb,

13   which reflect that Defendant's COVID-19 policies were "applicable to all employees." (Doc. 1 at

14   58-60). This is consistent with Plaintiff's pleadings and the exhibits attached to Defendant's

15   motion, evidencing the policies themselves. (Doc. 9-4 at 5-49).

16         "The ADA seeks to 'assure equality of opportunity' for individuals with disabilities or

17   perceived to have disabilities and these concerns are simply not implicated where an employee …

18   is treated like every other employee." *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 169

19   (2d Cir. 2024). Thus, a plaintiff fails to adequately plead a COVID-19-related ADA

20   discrimination claim where he is unable to allege that the employer classified him as having an

21   impairment that limited one of his major life activities, and instead, where he merely was required

22   to become vaccinated under the employer's policy applicable to all employees. *Id.* (quoting

23   *Speaks*, 2022 WL 344849 at *5).

24         As in *Cunningham*, here, "Plaintiff's theory also fails because it would yield absurd

25   results. Under Plaintiff's reasoning, the ADA would forbid employers from enforcing any number

26   of measures designed to stop the spread of COVID-19. Such measures would classify non-

27   compliant employees as 'impaired' by being more likely to contract and transmit the virus.

28   Employers who disciplined employees for refusing to wear a mask, wash their hands, or stay six

1    feet apart from others would be subject to disability discrimination claims under such a theory.

2    That interpretation of the ADA is unreasonable." *Cunningham,* 2023 WL 1991783, at *4.

3             Much like his allegation that Defendant misclassified him as having a disability,

4    Plaintiff's conclusory allegation that Plaintiff regarded him as having a disability is implausible.

5    As discussed above, the materials attached to both Plaintiff's complaint and Defendant's motion

6    make clear that Defendant's COVID-19 policies were generally applicable to all of its employees.

7    Plaintiff nevertheless alleges that, by implementing its COVID-19 policies and requiring that he

8    comply with them, Defendant regarded him as having the disability of a contagious disease. (Doc.

9    1 at 9, ¶¶ 45-46). This conclusory allegation is simply implausible in light of the general

10   applicability of Defendant's COVID-19 policies. The Court need not and does not accept as true

11   such a bare legal conclusion. *See Iqbal*, 556 U.S. at 678.

12            As with Plaintiff's allegation that Defendant misclassified him as having a disability, to

13   infer that Defendant regarded him as having a disability would require inferring that Defendant

14   regarded all of its employees as having a disability. This, too, is not a reasonable inference.

15            The Court finds that Plaintiff has not plausibly alleged that Defendant misclassified him as

16   disabled or regarded him as having a disability. Plaintiff's failure to allege the existence of this

17   essential element of his discrimination claim is by itself fatal to his case.

18                 ***b.  Plaintiff Allegations Concerning His Status as a Qualified Individual***

19            As to Plaintiff's status as a qualified individual, Defendant argues that, even if Plaintiff

20   has adequately alleged he was disabled under the ADA (which the undersigned finds he has not,

21   *supra*), his claim fails because he is not a qualified individual. (Doc. 9-1 at 18). Defendant cites

22   case law for the proposition that Plaintiff could not be a qualified individual because he posed a

23   "direct threat" to the health and safety of others in the workplace. *Id.* at 16-17.

24            The ADA defines a "qualified individual" as someone "with a disability who, with or

25   without reasonable accommodation, can perform the essential functions of the employment

26   position that such individual holds or desires." 42 U.S.C. § 12111(8). "The plain language of the

27   Act thus allows only those who are 'qualified individuals' to bring suit." *Weyer v. Twentieth*

28   *Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir. 2000).

1        Regarding Defendant's argument that Plaintiff was a "direct threat," "the assertion of an

2 affirmative defense may be considered properly on a motion to dismiss where the allegations in

3 the complaint suffice to establish the defense." *Sams v. YAHOO!, Inc.*, 713 F.3d 1175, 1179 (9th

4 Cir. 2013) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

5        Direct threat is a defense available to an ADA cause of action codified in the statute:

> Nothing in this subchapter shall require an entity to permit an individual to
> participate in or benefit from the goods, services, facilities, privileges, advantages
> and accommodations of such entity where such individual poses a direct threat to
> the health or safety of others. The term "direct threat" means a significant risk to
> the health or safety of others that cannot be eliminated by a modification of policies,
> practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182(b)(3). "The ADA's direct threat provision stems from the recognition in

*School Board of Nassau County v. Arline*, 480 U.S. 273, 287 (1987), of the importance of

prohibiting discrimination against individuals with disabilities while protecting others from

significant health and safety risks, resulting, for instance, from a contagious disease." *Bragdon v.*

*Abbott*, 524 U.S. 624, 649 (1998).

        "The entity asserting a 'direct threat' as a basis for excluding an individual bears a heavy

burden of demonstrating that the individual poses a significant risk to the health and safety of

others." *Lockett v. Catalina Channel Exp., Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007). In

determining whether an individual poses a direct threat to the health or safety of others, a public

entity must make an individualized assessment based on

> reasonable judgment that relies on current medical knowledge or on the best
> available objective evidence, to ascertain: [t]he nature, duration, and severity of the
> risk; the probability that the potential injury will actually occur; and whether
> reasonable modifications of policies, practices, or procedures or the provision of
> auxiliary aids or services will mitigate the risk.

29 C.F.R. § 36.208(b).

        The existence of a significant risk is determined from the standpoint of the health care

professional who refuses treatment or accommodation, and the risk assessment is based on the

medical or other objective, scientific evidence available to them and their profession, not simply

14

on their good-faith belief that a significant risk existed. *Bragdon*, 524 U.S. at 627–628. "[W]hile this determination 'may not be based on generalizations or stereotypes,' the assessment 'will not usually require the services of a physician,' and the public accommodation can consider public health authorities, including the [CDC]." *Giles v. Sprouts Farmers Market, Inc.*, No. 20-cv-2131-GPC-JLB, 2021 WL 2072379, at 5 (S.D. Cal. May 24, 2021) (citing ADA Title III Technical Assistance Manual § III-3.8000 and *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 876 (9th Cir. 2004)).

"To summarize, as long as a public entity accused of disability discrimination conducted an individualized assessment of whether an individual poses a direct threat—not based on generalized stereotypes, but based on reasonable judgment grounded in medical knowledge and public health authorities, and based on consideration of reasonable modifications—denying that individual access to the premises does not constitute discrimination under the ADA." *Witt v. Bristol Farms*, No. 21-CV-00411-BAS-AGS, 2021 WL 5203297, at *5 (S.D. Cal. Nov. 9, 2021).

Plaintiff's complaint includes allegations regarding Defendant's concerns about Plaintiff's potential threat to other employees. (Doc. 1 at 3, ¶ 8). Additionally, properly noticed exhibits attached to Defendant's motion outline that guidelines from the CDC and other public health authorities were the basis of Defendant's COVID-19 policy. (Doc. 9-1 at 5-10, 30-49). Plaintiff's allegations concede that Defendant's policies were based on CDC mitigation measures. (Doc. 1 at 3, ¶ 9). Plaintiff alleges that he came to work when he was directed not to by Defendant and was told to leave, due to his failure to follow COVID-19 policies. *Id.* at 11, ¶¶ 54-55. Plaintiff alleges that an individualized assessment needed to establish "direct threat" status was not done. *Id.* at 3, ¶ 8; 8, ¶¶ 37-41; 9, ¶¶ 45-47. This assertion is erroneous. As noted above, a medical professional need not examine Plaintiff to conduct an individualized assessment. Rather, considering guidelines promulgated by public health authorities, visibly noting an individual is not wearing a mask is an individualized assessment sufficient to determine whether they qualify as a "direct threat." *See Witt v. Bristol Farms*, No. 21-CV-00411-BAS-AGS, 2021 WL 5203297, at *6 (S.D. Cal. Nov. 9, 2021) ("[d]efendants' individualized assessment was whether a patient, such as Witt, was wearing a facial covering or not").

1    Plaintiff's allegation that there was no proof that he was a threat to others and thus his

2    "refusal to wear a mask . . . was not grounds for exclusion from the workplace" (Doc. 1 at 7, ¶ 35)

3    is also incorrect. As noted above, no proof is needed beyond absence of a mask or other failure to

4    adhere to policy based on public health authority guidelines. As such, Defendant's assessment of

5    Plaintiff as a "direct threat" was reasonable and, therefore, Plaintiff has failed to allege he was a

6    qualified individual. In addition, Plaintiff's arguments in his opposition largely repeat the claims

7    in his complaint or construe guidelines, statutes, and case law incorrectly. As an example,

8    Plaintiff quotes EEOC guidance, "Disability-related Inquiries and Medical Exams, A-9,"[4] for the

9    proposition "that an employer must have objective evidence of a disease before it makes medical

10   inquiries or imposes testing or treatments" (emphasis omitted). (Doc. 16 at 6-7). However,

11   Plaintiff's very quote establishes that such a requirement is limited to a scenario where "an

12   employer wishes to ask only a particular employee to answer such questions." *Id.* That is not the

13   case here, where Defendant's COVID-19 policy applied to all employees.

14       In addition to *Witt* cited above, the Court's conclusion is supported by recent decisions of

15   other courts addressing similar ADA claims and finding the direct threat defense dispositive

16   where a defendant's COVID-19 policy requires masks. *See, e.g., Giles v. Sprouts Farmers Mkt.,*

17   *Inc.*, No. 20-CV-2131-GPC-JLB, 2021 WL 2072379 (S.D. Cal. May 24, 2021); *Hernandez v. El*

18   *Pasoans Fighting Hunger*, No. EP-21-CV-00055-DCG, 2021 WL 2763827, at *1 (W.D. Tex.

19   July 1, 2021). For instance, in *Hernandez*, the court concluded that the ADA did not require

20   defendants to alter their mask policy for plaintiff when doing so would pose a direct threat to the

21   health and safety of others, including plaintiff himself, due to the COVID-19 pandemic.

22   *Hernandez*, 2021 WL 2763827, at *6. Similarly, in *Giles* the court found that defendant's policy

23   requiring masks for entry to its grocery store chain did not constitute "discrimination" under Title

24   III of the ADA "because Defendant conducted an individualized assessment of the direct threat

25   posed by Plaintiff by her unwillingness to wear a face mask or face shield[.]" *Giles*, 2021 WL

26

27   [4] It appears the exact language in Plaintiff's opposition is taken from U.S. Equal Emp. Opportunity Comm'n, "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws," and in particular the version "[u]pdated on October 28, 2021," accessible at https://www.kslegislature.gov/li_2022/b2021_22/

28   committees/ctte_spc_2021_gov_ovrrch_and_covid19_1/documents/testimony/20211029_67.pdf (last accessed November 1, 2024).

2072379, at *6. The *Witt*, *Hernandez*, and *Giles* courts construed circumstances similar to the present action and the Court finds no reason to diverge from their conclusions here.

### c. *Plaintiff's Termination*

As to Plaintiff's termination, Defendant argues that Plaintiff "was terminated for legitimate business reasons because he had repeatedly endangered others by refusing to comply with the COVID-19 [p]olicy and then disobeyed direct orders when put on leave." *Id.* at 18. Defendant argues that Plaintiff has alleged a legitimate, nondiscriminatory reason for termination in his complaint, namely insubordination, and cites case law for the proposition that the ADA permits termination for misconduct. *Id.* at 18-19.

Plaintiff indeed appears to have alleged that Defendant terminated him for violation of Defendant's COVID-19 policy. (Doc. 1 at 12, ¶ 63). He attaches an exhibit from Defendant's Chief Human Resources Officer, Ron Webb, outlining insubordination from failure to follow Defendant's COVID-19 policy as the reason for his termination. (Doc. 1 at 58-60). Plaintiff does not seem to dispute this as the reason for his termination. In his opposition, Plaintiff characterizes his actions as "protected activity" (Doc. 16 at 11) rather than insubordination and cites a number of inapplicable cases largely concerning vaccine mandates (*id.* at 9-10). Plaintiff argues Defendant's COVID-19 policy "cannot be considered a 'legitimate' policy because it fails to comply with the ADA and it has no legal authority behind its implementation, oversight or enforcement. Therefore, it is illegal. No 'exemption' is required, neither religious nor medical, because the plaintiff can simply claim his rights . . . Hence, [D]efendant cannot claim that [it] terminated [P]laintiff for 'legitimate business reasons.'" *Id.* at 10-11.

As noted above, Plaintiff is incorrect. The Court finds that Plaintiff has failed to allege improper termination for protected activity. *See Mickealson v. Cummins, Inc.*, 792 F. App'x 438, 440 (9th Cir. 2019) ("[Defendant] articulated a legitimate, nondiscriminatory reason for [plaintiff's] termination by presenting evidence that [plaintiff] was terminated because he was insubordinate, not because of his disability . . . [plaintiff] failed to present direct evidence or evidence that gives rise to an inference that his disability was a cause for his termination to rebut this legitimate justification . . ."); *see West v. Scott Lab'ys, Inc.*, No. 22-CV-07649-CRB, 2023

WL 2632210, at *6 (N.D. Cal. Mar. 24, 2023), aff'd, No. 23-15502, 2023 WL 6172009 (9th Cir. Sept. 22, 2023) ("[Plaintiff] was not terminated for objecting to [defendants'] COVID-19 policy. Rather, he was terminated for refusing to comply with it.") (affirming dismissal of plaintiff's COVID-19-based ADA claim with prejudice).

### C. The Complaint Fails to State a Claim of Retaliation under the ADA

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004).

Here, Plaintiff's claim fails because he has not demonstrated that there was a causal link between his alleged protected activity and an adverse employment action. Plaintiff states that Defendant took two adverse actions, namely (1) implementing a COVID-19 policy and (2) terminating his employment. *See* (Doc. 1).

First, as Plaintiff observes in his complaint and Defendant in its motion, Defendant enacted its COVID-19 policy before Plaintiff opposed it. *Id.* at 2, ¶ 7; Doc. 9-1 at 19-20). Defendant did not enact this policy in response to Plaintiff's objection. Additionally, Plaintiff does not allege that Defendant instituted the policy because of him. *See* (Doc. 1). It is, therefore, unreasonable to infer that there was a causal connection between Plaintiff's criticism of Defendant's COVID-19 policy and the implementation of the policy. *See O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1311 (D. Haw. 2022) ("Plaintiffs are unlikely to establish a prima facie case of retaliation . . . because the adverse employment actions . . . appear to be unconnected to their [accommodation] requests. Indeed, the vaccine policy was established, as well as the consequences for failing to comply . . . before Plaintiffs submitted their [accommodation] requests.").

Second, Plaintiff was not terminated for objecting to Defendant's COVID-19 policy.

18

Rather, as noted above in Section A-B, he was terminated for refusing to comply with it. (Doc. 1 at 58-60). Thus, it is also unreasonable to infer that there was a causal connection between Plaintiff's criticism of Defendant's COVID-19 policy and his termination. *See Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 444-45 (D. Mass. 2021), aff'd, 32 F.4th 82 (1st Cir. 2022) (finding that plaintiffs likely could not show a causal connection between protected activity and an adverse employment action where defendant asserted that "plaintiffs [were] subject to unpaid leave and potential termination not because they requested exemption, but because they were not approved and remain[ed] noncompliant with the [v]accination [p]olicy").

The Court finds that Plaintiff fails to allege a retaliation claim under the ADA. "Because [Defendant's] COVID-19 mitigation and vaccination policies existed before [Plaintiff] opposed those policies, it is not reasonable to infer that there was a causal connection between [his] criticism of the policy and [his] termination." *Lundstrom v. Contra Costa Health Servs.*, No. 22-CV-06227-CRB, 2022 WL 17330842, at *7 (N.D. Cal. Nov. 29, 2022), aff'd, No. 22-16946, 2023 WL 6140588 (9th Cir. Sept. 20, 2023) (quotations omitted).

### D.  Plaintiff's Remaining Claims

#### a.  *State Law Causes of Action*

As noted above, Plaintiff cannot plausibly allege any claims related to reasonable accommodations (Doc. 1 at 4, ¶ 20; at 5, ¶ 27) since he has not plausibly alleged a disability nor status as a qualified individual.

Though Plaintiff mentions a "hostile work environment" in his complaint (*id.* at 8, ¶¶ 37-39; at 8-9, ¶¶ 42-44; at 19-20, ¶ 118; at 23-24, ¶ 145), he does not allege any facts that would establish such a claim under an applicable law, such as Title VII of the Civil Rights Act. To determine whether an environment is sufficiently hostile or abusive to violate Tile VII, the Court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008)). "Not every insult or harassing comment

1   will constitute a hostile work environment." *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir.

2   2000). The standard for judging hostility is meant to "ensure that Title VII does not become a

3   'general civility code.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore*

4   *Servs., Inc.*, 523 U.S. 75, 80 (1998)).

5        Plaintiff pleads no such facts. Additionally, any such claim brought under the ADA would

6   fail for the same reason any claims related to reasonable accommodations would fail: Plaintiff has

7   not plausibly alleged a disability nor status as a qualified individual.

8        Plaintiff's failure to adequately plead claims under federal law deprives this Court of

9   federal question jurisdiction, which in turn likely would result in a decision to decline to exercise

10  supplemental jurisdiction over Plaintiff's state law claims.  *E.g.*, *Acri v. Varian Assocs.*, 114 F.3d

11  999, 1000 (9th Cir. 1997) (noting that state law claims should be dismissed if federal claims are

12  dismissed).  For these reasons, the Court abstains from evaluating Plaintiff's state law claims

13  regarding invasion of privacy and defamation, since it appears that federal subject matter

14  jurisdiction is lacking.

15                    ***b.  Plaintiff's Exhaustion of Remedies***

16       A plaintiff must first file a timely EEOC complaint against the allegedly discriminatory

17  party before bringing an ADA suit in federal court. *See EEOC v. Farmer Bros. Co.*, 31 F.3d 891,

18  899 (9th Cir.1994). Because California is a "deferral" state, the claim must be filed within 300

19  days of the claimed event of discrimination. *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir.

20  2006). The filing of a timely charge of discrimination with the EEOC is not a jurisdictional

21  prerequisite to filing suit, but is a requirement subject to equitable doctrines such as waiver and

22  tolling. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982). An equitable exception

23  to the exhaustion requirement is available when an EEOC representative misleads the plaintiff

24  concerning his claim. *See Rodriguez v. Airborne Express*, 265 F.3d 890, 901–02 (9th Cir. 2001).

25  Such relief may be granted to a plaintiff who: (1) diligently pursued his claim; (2) was

26  misinformed or misled by the administrative agency responsible for processing his charge; (3)

27  relied in fact on the misinformation or misrepresentations of that agency, causing him to fail to

28  exhaust his administrative remedies; and (4) was acting *pro se* at the time. *Id.* at 902.

1     Plaintiff alleges filing a grievance with the EEOC regarding his claim of religious

2  exemption. (Doc. 1 at 8, ¶¶ 37-39). He then alleges withdrawing this grievance to file another

3  under Title I of the ADA. (*Id.* at 9, ¶¶ 45-46.) Attached as an exhibit to Defendant's motion are

4  two EEOC Form 5s ("Charge of Discrimination"), as well as two letters from the EEOC, one

5  granting withdrawal of the earlier filed complaint and the other a notice of right to sue (Doc. 9-3

6  at 5-17). The first EEOC charge attached to Defendant's motion is signed December 17, 2021.

7  (*Id.* at 5). The withdrawal letter is signed July 21, 2022. (*Id.* at 10). The second EEOC Form 5,

8  alleging ADA discrimination and retaliation, is signed June 3, 2022. (*Id.* at 12). The notice of

9  right to sue is signed July 22, 2022. (*Id.* at 16).

10     Plaintiff has not pled any facts providing for equitable exceptions to the exhaustion

11  requirement. Insofar as Plaintiff is challenging the original COVID-19 policy provisions, dated

12  April 23, 2020 (Doc. 9-4 at 5), Plaintiff's claims are barred for failing to timely exhaust

13  administrative remedies. The revised COVID-19 policy appears to be dated October 11, 2021, but

14  with an "effective date" of January 1, 2021 (*id.* at 30). The Court, then, is uncertain what the

15  actual date was when each provision was put into effect. Defendant's motion states "in January

16  2021, [Defendant] implemented its mandatory [COVID]-19 Prevention Program policy in

17  response to new state legislation," citing to exhibit 6. (Doc. 9-1 at 12). It then states the policy

18  was "partially revised" in October 2021. As far as claims relating to the prevention program

19  policy, attached as exhibit 6 (Doc. 9-4 at 12-24) and dated January 11, 2021, Plaintiff's claims

20  would be barred. As far as claims relating to the revised policy go, if it was put into effect January

21  1, 2021, Plaintiff's claims would be barred. If it was in fact October 11, 2021 when it came into

22  effect, Plaintiff's claims would not be barred. Plaintiff does not allege, nor appears to have filed,

23  any additional or amended EEOC charge after his termination and, therefore, claims related to his

24  termination are barred.

25                         *     *     *     *     *

26     Plaintiff has failed to plausibly allege facts to state a claim under the ADA. "A *pro se*

27  complaint may be dismissed with prejudice when 'it is absolutely clear that the deficiencies of the

28  complaint could not be cured by amendment.'" *Ismail v. Cnty. of Orange*, 693 F. App'x 507, 511-

12 (9th Cir. 2017) (quoting *Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015)). The deficiencies in Plaintiff's complaint cannot be cured by amendment. As such, the undersigned will recommend that Plaintiff's complaint be dismissed with prejudice.

## IV.   CONCLUSION AND ORDER

For the reasons set forth above, IT IS HEREBY RECOMMENDED:

1.   Defendant's motion to dismiss pursuant to Fed. R. Civ. Pro. (12)(b)(6) (Doc. 9) be GRANTED;

2.   Plaintiff's complaint (Doc. 1) be DISMISSED without leave to amend; and

3.   The Clerk of the Court be directed to close this case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. **Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge** when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   **November 12, 2024**

UNITED STATES MAGISTRATE JUDGE

22